[748 NYS2d 563]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT BIERENBAUM, Appellant.

First Department, October 22, 2002

**APPEARANCES OF COUNSEL**

*Mark Dwyer* of counsel (*Robert M. Morgenthau, District Attorney*, New York County, attorney), for respondent.

*Diarmuid White* of counsel (*Brendan White* on the brief; *White & White* and *Scott H. Greenfield*, attorneys), for appellant.

### OPINION OF THE COURT

MARLOW, J.

A jury convicted Robert Bierenbaum of second-degree murder based on circumstantial evidence that on July 7, 1985 he intentionally killed his wife, Gail Katz Bierenbaum, in their Manhattan apartment; transported her body to a New Jersey airport the same day; loaded it onto a small private plane; and piloted it over the Atlantic Ocean where he discarded her remains. Neither her body nor her remains has ever been found.

On this appeal, we address the following four issues:

First, defendant contends the trial evidence is legally insufficient and the verdict is against the weight of the evidence.

Second, defendant complains that the trial court erroneously allowed the jury to learn (a) of the existence and nature of a letter written to his wife by his psychiatrist warning her of the danger defendant posed to her; and (b) of several of her verbal statements to various people describing defendant's threatening remarks and otherwise negative behavior.

Third, he argues that the Trial Justice should have precluded, and that the prosecutor inappropriately used, evidence that defendant choked his wife rendering her unconscious in the autumn of 1983, including evidence of her statements to her cousin over the phone, which the court admitted as "excited utterances."

Fourth, he urges that the court incorrectly allowed the People to introduce opinion testimony by a medical examiner, and demonstrative and opinion evidence by a police pilot and two other experts, that it is possible for a surgeon/pilot, alone, to dismember a 110-pound body in 10 minutes, load a 36-inch-long package containing the body's disarticulated remains onto a small airplane, and, also while alone in the air, throw it into the ocean.

We agree with only one claim of error. However, because we find it harmless, we affirm.

### THE CIRCUMSTANTIAL EVIDENCE

That the victim died July 7, 1985 is conceded. That defendant was the last person who saw her, and who was known to

have been alone with her until 11:00 A.M. that day, cannot be persuasively disputed on the basis of this record. Contested are the way and reason her life ended, the way her killer disposed of her body immediately thereafter, and her killer's identity and state of mind.

The trial testimony and physical exhibits revealed the following:

In 1982 defendant and the victim married. From the beginning, they quarreled frequently. No witness disputed that their discord and fighting reached a level characterized by threats against the victim and at least one previous violent act by defendant against her. Defendant essentially admitted as much, and was heard to say, more than once, that during one argument there was "physical contact," that their last argument was "explosive" and "severe," and that he was frustrated in his marriage because they argued constantly. He also said that he hated the victim so much, and that she would get him so upset, that he wanted to kill her.

They both complained many times to many people that their marriage was loveless and their life together was stormy. On one occasion a coworker overheard defendant in a common work area arguing loudly with his wife over the telephone. The victim would complain also that defendant tried to exert excessive control over her, and she expressed fear of him more than once. The record is replete with evidence depicting events and statements which motivated the victim to end her marriage. In 1984, she was so unhappy that she consulted a divorce lawyer.

One day in the fall of 1983, at about 3:00 P.M., the victim called her cousin, Hillard Wiese, an attorney, at his office. "[S]peaking in very hushed tones and very rapidly" and "sound-[ing] extremely upset," she told him that she and defendant had a fight the night or day before. She said that he, not for the first time, had choked her, although this was the first time she was thereby rendered unconscious. When she came to, he begged her forgiveness and promised it would never happen again. She told Wiese she was speaking quickly and softly because she was expecting defendant. She called Wiese again the following day to let him know she took his advice and was staying with her grandfather.

On another occasion, while the couple was watching a television program about the von Bulow murder case, defendant told the victim that the "problem with Claus von Bulow is that he left evidence and [defendant] would not leave evidence." The testimony revealed that the victim perceived this statement as a threat.

The trial record also makes it clear—notwithstanding the victim occasionally vacillated about terminating her marriage—this couple was on the verge of divorce in July 1985. While married to defendant, the victim had an affair with at least one other man; just before the day she disappeared she stated to a friend she was about to tell defendant she wanted a divorce; she had borrowed money to prepare to leave; she said she was seeing one or two other men and that she loved one of them; she was looking for an apartment and was seen with circled newspaper ads for apartment rentals the day before she disappeared and her friend had offered her a place in Connecticut to stay while she got herself resettled. Defendant himself said his wife told him she wanted a divorce.

The proof is most telling that on the very day the victim disappeared, she intended to confront defendant with her decision to leave him. She was also determined to make it clear to defendant that she would use a letter, written to her by his psychiatrist warning her of the danger he posed to her, in order to humiliate him with his professional peers should he refuse to meet her divorce settlement demands. To that same end, she also planned to threaten to expose his and his father's alleged multimillion-dollar Medicare fraud.

At the time the deceased disappeared, defendant was a surgical resident at Maimonides Hospital and a licensed pilot. On July 7, 1985, at 4:30 P.M., he rented a Cessna 172 plane at Caldwell Airport in Fairfield, New Jersey. He returned it after one hour and 56 minutes, giving him time enough to fly round trip approximately 165 miles over a part of the Atlantic Ocean. From the rental office's vantage point, one would not have been able to see defendant on the tarmac getting ready to board— and possibly load luggage or other items onto—the plane, which was in a position readily accessible by automobile for such purposes.

Later the same day, around 6:30 P.M., defendant arrived alone at his sister's Montclair, New Jersey home for his nephew's birthday party. There he told his father that he and his wife had an argument earlier that day, that she left for Central Park, and she had not returned by the time he left Manhattan. Significantly, he omitted telling his father that he had flown an airplane for nearly two hours that very afternoon.

That evening, he went to the home of his friend, Dr. Scott Baranoff. From there, he telephoned his apartment more than once. A seemingly distraught defendant also told Baranoff about the argument, adding that his wife had not yet returned

after having left their apartment wearing shorts, a halter top and sandals. However, he again omitted to mention that he had rented and flown an airplane for almost two hours that same afternoon, a consistent omission whenever he told others about the events of July 7.

When defendant returned to their Manhattan apartment, he telephoned his wife's friend and former psychology teacher, Dr. Yvette Feis. He told her of the argument and that the victim had left for Central Park with a blanket for sunbathing. Defendant and Dr. Feis spoke daily that first week, but during the first few calls she urged him to contact the police and to speak to the doorman.

At 9:00 P.M. the next night (July 8), he finally spoke to Detective Vergilio Dalsass, telling him that his wife left their apartment at 11:00 A.M. on July 7 to sunbathe in Central Park wearing pink shorts and a white t-shirt. He stated he had remained behind in their apartment until 5:30 P.M. before leaving for his sister's New Jersey home.

Before ending that July 8 interview, Detective Dalsass repeated his appeal to defendant to leave out nothing, saying:

> "I pretty much told him that any information that will assist in finding Gail was rather important. He was the individual that las[t] saw her in the apartment. Any friends, relatives, anything that could assist me would certainly be very beneficial in locating her as quickly as possible."

Defendant offered that Gail had, years earlier, attempted suicide. Yet, he omitted to tell the detective that he was a pilot and that on the previous afternoon he rented a plane from a New Jersey airport between 4:30 P.M. and 6:30 P.M. for a two-hour flight. He also failed to mention to both Detective Dalsass and later to Detective Thomas O'Malley—as he had indeed told others—that he allegedly left his apartment Sunday afternoon to search for his missing wife in Central Park and there allegedly found her towel and suntan oil.

For the entire week immediately following the victim's disappearance, defendant failed to return Detective Dalsass' approximately eight telephone answering machine messages. However, on July 10, he called Detective O'Malley inquiring how the investigation was proceeding and met with him on July 13. During that meeting he told O'Malley that he drove his father's Cadillac to his sister's New Jersey home on July 7, instead of his own [smaller] Datsun, as his car allegedly had mechanical problems.

Defendant called a number of the deceased's friends voicing expressions of concern that she may have harmed herself, specifically attributing that notion to comments made to him by her therapist, Dr. Sybil Baran. However, Dr. Baran unequivocally denied she had ever said anything like that to defendant or that she ever discussed anything with him on that subject. To the contrary, it was her professional opinion, based on three years of treating the deceased once or twice weekly, that she was not suicidal.

Defendant also suggested to others that his wife was depressed and thus may have killed herself, disclosing also that she had tried to commit suicide years earlier.

Furthermore, on July 14, while with his wife's friend Maryann DeCesare and a group of friends who were searching for her and posting missing person signs in Central Park and elsewhere, defendant quipped that he thought his wife—who was missing for a full week—was on a shopping spree at Bloomingdale's, adding, "You know what a JAP* she was." When the search party returned to the marital apartment—only seven days after his wife's disappearance—defendant volunteered to his mother-in-law, in DeCesare's presence, "I wonder why the cat got sick. I had to take the rug out to be cleaned."

Later on July 14, at a meeting at Detective Dalsass' office arranged by the deceased's sister Alayne Katz, and with her parents and defendant's father also present, Dalsass interviewed defendant again face-to-face. The detective specifically made it clear to defendant the importance of omitting nothing in describing and detailing for him the last three days his wife and he spent together:

> "I opened up with anything that might be instrumental in locating Gail. However minor it might be it was very important. That anything said, however insignificant it could possibly be used to find her and locate her * * *

> "I told the defendant that he should give me a narration of the time he spent over the last weekend. Not excluding anything from the time he last saw, going back as much as he can * * *

> "I told him that any information is useful. Anything

---

\* *"Offensive Slang* A Jewish-American girl or woman regarded as being pampered or overindulged" (American Heritage Dictionary of the English Language 935 [4th ed 2000]).

could be helpful in locating Gail. Something that might be very innocent might develop into a lead where she might be."

Notwithstanding these and other direct, uncomplicated admonitions, defendant omitted telling Detective Dalsass that he and his wife had argued that Sunday morning. However, in the July 8 interview, he had specifically denied that the reason she left the apartment at 11:00 A.M. to sunbathe in Central Park was related to an argument that morning. In addition, he had, the day before (July 13), told Detective O'Malley that he and his wife had argued the night before she "disappeared" and continued arguing on the morning of July 7, prompting her to go to Central Park at 11:00 A.M. to "cool off."

He again omitted on July 14 to tell Dalsass—and O'Malley as well the day before—that he was a licensed pilot, rented a plane in New Jersey, and flew it for two hours from 4:30 P.M. to 6:30 P.M. on July 7. Instead, he falsely told both detectives, on a total of at least three occasions, that he stayed in his Manhattan apartment all day until 5:30 P.M., emphasizing to Dalsass that he was "positive" that "he left [his apartment] at 5:30 [P.M.]." He also changed his claim that on July 7 he had spoken to the doorman who, he had originally maintained, said he saw the victim leave the building Sunday shortly after 11:00 A.M. In fact, the doorman did not speak to defendant July 7 and could not recall seeing either defendant or the deceased that day.

Further, he told Dalsass, in some detail, that on Saturday afternoon, July 6, while he and Gail shopped at various local stores, they argued about finances and other matters which he refused to disclose. He said the day ended with a Saturday evening, candlelight dinner in their apartment, but he again declined to discuss whether this interlude, described by him as romantic, helped resolve the argument. Detective Dalsass expressed frustration over defendant's lack of cooperation and his delays in returning phone calls and providing the police with information to aid their search efforts.

Furthermore, although defendant told friends he searched for the deceased in Central Park on July 7 between 11:00 A.M. and 5:30 P.M. and found her towel and suntan oil in the park, he never shared that highly significant detail with O'Malley or Dalsass on the two interviews each had held with him during the seven days following July 7. To them he insisted that he had remained in the apartment until 5:30 P.M. without leaving at all.

The record also reveals that, although in July defendant told Detective Dalsass he would respond to his request to view the apartment, defendant in fact did not contact Dalsass until September 12, 1985, and he did not permit entry until September 30. When Dalsass arrived, the crime scene unit was only allowed to search for fingerprints, the victim's diary and her address book. The investigators were not permitted to check for blood or hair samples or to search for "anything that we could document that a crime took place."

In the days, weeks, months and years following his wife's disappearance, defendant made several inconsistent, unfounded or otherwise suspect and incriminating statements. Among them are the following examples: he told Detective Dalsass that he and his wife had no argument on July 7, but he told Detective O'Malley that they argued on July 6 and continued on the morning of July 7. He told her friend, Dr. Feis, that they had a severe argument the day of her disappearance, more severe than he had originally described to her and to various other people. He admitted that during the July 7 argument he failed to heed his psychiatrist's advice to try to defuse the situation and that this argument on the day she disappeared became "explosive." He told others that he and the victim argued just before she left for Central Park "to cool off"; another that a private investigator he had hired found evidence she was living in California probably with financial help from her family; others that she had a drug problem, that she may have disappeared with drug dealers and that she probably was murdered by her "druggie friends"; others that she may have run off to live with someone in the Caribbean; and others that his missing wife was seen after July 7, 1985 "in some type of fugue state" in the Central Park area and that it was unlikely she would return.

To one of his Southampton summer housemates in July 1985, with a demeanor described as lacking in emotion, he said he and his wife fought on July 7 and "she had taken a towel and some suntan lotion and had gone to Central Park. She wanted to cool off and he waited a couple of hours and then he went looking for her and he found the towel and the suntan lotion but she was gone." Also, shortly after she vanished, he told his Southampton summer landlord that after his wife left he went through her drawers and found cocaine, prompting him to believe she went off with drug dealers. To yet another, he described his missing wife as a tramp, off living with someone else.

In addition, he made contradictory statements to the police and others about whether he cleaned his living room rug shortly after July 7, telling the police he did not, but telling the victim's friend, Dr. Feis, and others that he had.

A few weeks after his wife disappeared, defendant began dating a nurse whom he knew from Maimonides Hospital where they were employed. In late July or early August, defendant asked her out, and they became intimate on their first date. They saw each other socially about five times over the next six weeks, until she abruptly ended their relationship because, in her view, he unjustifiably "attacked" her verbally one evening in a restaurant. Early in that period, before they began dating, and therefore significantly before the end of September, he falsely told her the police had searched his apartment and car and found him to be "clean." Furthermore, she testified that, during that early period, he expressed no concern about his wife's disappearance.

Thereafter, commencing in September 1985 and continuing for a period just under one year, defendant invited a medical student, Dr. Roberta Karnofsky, who worked under his direct supervision at Coney Island Hospital, to live with him in the marital apartment. They began dating a month before she moved in. During their entire relationship, she did not observe him make any efforts to locate his missing wife.

Dr. Karnofsky also remembered a phone call defendant received one morning at 3 o'clock, a few months after she moved in. The call came from the police who insisted that he immediately come in to view a woman they had found at the New York Port Authority Bus Terminal, someone they thought might be his missing wife. After he hung up and she asked him whether under the circumstances she should pack her things and vacate the apartment, he told her not to worry because he "doubt [s] it is Gail." Although he had expressed some apparent frustration because the police were insisting he come to the terminal at that hour, he complied. When he later returned, he tersely remarked to his roommate that it was not his wife.

At one point while they lived together, on a day that Dr. Karnofsky was angry or annoyed with defendant, and, having heard a number of accusatory answering machine messages directed at defendant, she confronted him "to see what his reaction [would be]":

> "What I said to him was, well, I think that if you
> did this and if it really happened as some people

seem to think it did, that perhaps something happened in the apartment and you intentionally or unintentionally—Gail was hurt, you could have put her in one of those big flight bags or duffel bags and carried her out of the apartment since she was very small, put her in the back of your car, drive out to the airport and thrown her body out of the plane."

Defendant displayed no reaction, " [h]e didn't say anything."

About midway through their one-year relationship, defendant gave his approval to have Dr. Karnofsky's girlfriend, Sharon, also move into the apartment temporarily. She expressed this homicide theory to Sharon one day while defendant was not home. Together, the two women looked for and found defendant's flight log. In it, they located a handwritten entry which appeared to have been changed from the original notation of July 7, 1985 to the substituted date of August 7, 1985. The jury saw this altered document.

Another woman whom he dated in Las Vegas in 1995 asked him on their first date whether he had ever been married. When he exhibited hesitation in responding to her, she jokingly asked him if he had killed his wife. Defendant was "pretty surprised and stunned" and asked her what she knew. When she asked what had happened, he told her his wife may have committed suicide or may have met with foul play, as she had dated a variety of men. He also disclosed to his date that in the past he had a bad temper, but that it had gotten much better. Finally, she observed that defendant was "meticulous," even "compulsive," about making flight log entries.

Through the testimony of several witnesses, including four expert witnesses—New York City's Chief Medical Examiner, an experienced New York City police pilot, an aviation safety inspector, and an airline transport pilot/flight instructor/FAA flight test examiner—the People established that it was physically possible for defendant, a surgical resident and pilot, unassisted, to disarticulate a recently expired body of the victim's size (5 feet, 3 inches tall, weighing 110 pounds) within 10 minutes, pack her dismembered torso and limbs into a flight/duffel bag and carry them through an unmonitored rear exit of his apartment building for a distance of two blocks to his garaged car. They also proved that it was also feasible for him to so transport the bag containing the decedent's remains—whether disarticulated or intact—to Caldwell Airport in Fairfield, New Jersey, and load it aboard a Cessna 172 plane

directly from the car parked alongside on the tarmac, all unnoticed. They further established that it was possible for defendant, also alone, to pilot the Cessna 172 over the Atlantic Ocean as much as 85 miles east of the shoreline, maintain sufficient control of this relatively easy-to-operate plane so as to singlehandedly throw these human remains from the air into the ocean, and then land back at the same airport, all in less than two hours of flight time. Without objection, the prosecution showed the jury a videotape specifically prepared for trial, demonstrating how defendant could have accomplished this from the point of loading the 110-pound body onto the plane, discarding it over the ocean, and landing back at the same airport.

DISCUSSION

## 1. *Reasonable Doubt*

■ In our role of reviewing the sufficiency of trial evidence as an appellate court in a purely circumstantial evidence case, we must decide whether a guilty verdict is based on legally sufficient evidence by "determin [ing] whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People" (*People v Williams*, 84 NY2d 925, 926 [citations omitted]). Judged by that standard, we find and hold that the circumstantial evidence adduced at this trial decisively extinguishes any doubt that defendant Robert Bierenbaum, and no one else, intentionally killed his wife Gail Katz Bierenbaum, brought her body to Caldwell Airport in Fairfield, New Jersey, loaded it onto a small plane, flew it over the Atlantic Ocean, and, there, dumped her remains.

Furthermore, in a case based on circumstantial evidence—as this is—we must also adhere to the dictates of *People v Benzinger* (36 NY2d 29, 32) expressed again in *People v Seifert* (152 AD2d 433, 440, *lv denied* 75 NY2d 924) as follows: " [w]hen reviewing a case based exclusively upon circumstantial evidence, the facts must be viewed in the light most favorable to the People [citations omitted], and it must be assumed that the jury credited the People's witnesses and gave the People's evidence 'the full weight that might reasonably be accorded it' (*People v Benzinger*, [*supra* at 32; other citations omitted])."

The two circumstances, i.e., (1) that the police never recovered the victim's body and (2) that no one other than the victim and her killer personally witnessed the violent act which

ended her life, do not bar a valid murder conviction under current law. That was not always the case. Thus, under *Ruloff v People* (18 NY 179), those two facts once precluded a murder prosecution in New York. In that 1858 case, the Court of Appeals held, "without direct proof of the death, or of the violence or other act of the defendant which is alleged to have produced death," a murder conviction may not stand (*id.* at 184).

However, in 1982, in *People v Lipsky* (57 NY2d 560), the Court of Appeals overruled *Ruloff.* Indeed, the *Lipsky* Court expressed "no hesitancy" in holding that "the corpus delicti may be established by circumstantial evidence" (*id.* at 569). The clear and direct language the *Lipsky* Court selected to disavow the 124-year-old *Ruloff* ruling is significant in light of the *Ruloff* facts, because those facts are, in several key ways, similar to those at bar. No murder weapon was ever found in either case, neither defendant confessed, neither murder was witnessed, and neither victim's body—or any remains—was ever found.

As defendant now also argues that the verdict is against the weight of the evidence, this Court, in its unique factual reviewing role, must also determine whether, "based on all the credible evidence, a different finding would not have been unreasonable" (*People v Bleakley*, 69 NY2d 490, 495). Should we answer that inquiry in the affirmative, we next "must * * * 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' (*People ex rel. MacCracken v Miller*, 291 NY 55, 62 [other citations omitted]). If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict (CPL 470.20 [2])." (*Id.*)

Applying these principles to the evidence in this purely circumstantial murder case, our review convinces us that, notwithstanding the facial attractiveness of some of the factual arguments defendant's appellate counsel presents, this guilty verdict, based on the proof this jury heard and saw, is the only fair and reasonable outcome (*see People v Sanchez*, 61 NY2d 1022, 1024).

That is not to say that some of the many items of incriminating evidence, when each is evaluated in isolation, are not susceptible to arguable inferences which at first blush seem consistent with defendant's claim of innocence. But, when one attentively reviews and critically assesses all the circumstantial evidence, cast in its aggregated and interwoven symmetry, and

after applying all natural and reasonable inferences, the conclusion that defendant murdered his wife on July 7, 1985 becomes inescapable, and the evidence excludes beyond a reasonable doubt any reasonable hypothesis of innocence.

This abundant array of damning circumstantial evidence proves beyond any reasonable doubt that defendant intentionally killed this victim; that he did it on the date, at the time and for the reason the People offered; and that he disposed of her body as the People contend. When one applies the appropriate legal principles, these conclusions become most compelling for a rational, dispassionate and attentive factfinder.

To begin with, any notion that the victim disappeared in some way other than her actual demise on July 7, 1985 is utterly dispelled by a combination of the legitimate inferences raised by all the proof and by defendant's concession that his wife died, and that she died that day. There is every reason in this record to find that defendant was the last person to see her alive at 11:00 A.M. that Sunday morning. Apart from the fact that there is no reliable evidence that anyone else saw or heard from her thereafter, defendant repeatedly admitted to several people, including his father, that he last saw her then. In fact, defendant even misstated to Detective O'Malley that the building doorman said he last saw her leave the building shortly after 11 o'clock on July 7. Defendant later retracted that claim.

Second, he admitted that their marriage was unhappy and virtually over, and that his own anger had reached a level tempting him toward violence against her because he was so frustrated by the strife between them. Moreover, he told Dr. Feis—after withholding the whole truth from others, and from her during their many earlier conversations subsequent to July 7—that his last encounter with his wife on July 7 ended in an argument more "severe" than he had previously let on, that it "had become explosive," and that in its midst he had failed to heed his psychiatrist's advice to "defuse the situation." More specifically, he also admitted to his father that they had "difficulty in adjusting to each other," and in 1983 " [t]hat they had an argument, had some physical contact." By way of corroboration, Dr. Leigh McCullough testified that in November 1983 she saw "finger shaped" bruises on the victim's neck, and the latter told her that defendant choked her when he became angry at seeing her smoking a cigarette.

By 1985, the parties' three-year-old marriage can fittingly be described as an emotional battleground. Verbal strife plagued

it, express and implied threats uttered by defendant aggravated it, and defendant's admitted violence against his victim during at least one episode surely worsened it. By July, it was against this backdrop that a divorce was virtually inevitable—a situation exacerbated further by defendant's knowledge of his wife's adultery.

Armed with circled apartment rental ads the day before she disappeared, the victim declared to her close friend, Denise Kasenbaum, that she was leaving defendant that weekend. The evidence is also strong that she was determined to confront defendant with her divorce demands. Her stated intentions, should defendant refuse to accede to those demands, were plain. First, she would threaten to humiliate him by publishing to his professional colleagues and superiors a warning letter she had received from defendant's treating psychiatrist; and, second, she would threaten to expose an alleged Medicare fraud in which she claimed he and his father were allegedly involved. As discussed at greater length elsewhere in this opinion, notwithstanding defendant's contentions to the contrary, this evidence is clearly relevant not only to motive, but to intent and identity.

That the victim had once before confronted him with the same letter and her same threat weeks or months before July 7 does not, as defendant now urges, diminish the potential explosiveness of her intended confrontation on the weekend she died, because the testimony is otherwise clear and certain that she once again intended to tell defendant over that weekend that she was divorcing him. To reject any notion that the victim intended to use the letter a second time simply because she may have already used it once before would unreasonably ignore her various statements, her reasons for wanting a divorce, and her state of mind as that fateful weekend approached.

While no one other than the victim and defendant was present to observe what transpired in the marital dwelling on the morning of July 7, the inference from the foregoing circumstantial facts is most compelling, if not irresistible, that they had a hostile confrontation that weekend about the future of their marriage, its serious problems, and how each would deal with them. No other inference finds any support in this record, and none could survive an impartial and objective assessment of the proof, particularly in light of defendant's admission that their argument was "severe" and "had become explosive."

These facts establish beyond any question that this marriage existed in a volatile, highly emotional, turbulent and dysfunc-

tional environment. This couple had a history of angry words and deeds, of threats, and of violence; they harbored a wide range of feelings ranging from ambivalence to profound hostility toward each other, and, beyond their generalized resentment, defendant had evident motives to kill the decedent. Surely, killing her would not only end their miserable and loveless marriage, and end it without the expenses and financial burdens of divorce, but it would also stop her from carrying out her threats to expose his violence and his alleged fraud. Exposing these transgressions, if it did not disgrace him, would most certainly compromise his professional standing, damage his personal reputation, and injure his short- and long-term career plans and income potential.

Moreover, his behavior with other women so soon after July 7 is inconsistent with behavior one would reasonably anticipate from a husband whose wife had mysteriously disappeared, notwithstanding that their marriage was stormy. Indeed, his behavior utterly belies his claims of ignorance of his victim's whereabouts. This conclusion is effortlessly drawn not nearly so much because he began dating so soon, but much more because of his obvious and expressed confidence his wife would never return.

After all, he made several statements making it appear he had no idea how his wife disappeared, where she was, and when or whether she would ever return. Contemporaneously with these expressions of despair and bewilderment, he promptly had sexual relations on his first date with a nurse in the very room he and his victim had rented for the 1985 summer in the Hamptons, less than a month after she "vanished." One can reasonably infer that he knew she would not suddenly return and appear at his bedside.

Furthermore, he invited a different woman to move into the marital apartment with him in September 1985. When a few months later he received an early morning telephone call from the police indicating they may have had his lost wife at the precinct, he was less than anxious to accede to their request that he immediately leave his bed to possibly identify his "inexplicably missing" wife. At that point and with no expressed hesitation or apparent lack of confidence, he told his paramour to remain in bed through the night in the marital apartment, because he "doubt [ed]" it was his wife. This aspect of the evidence, when viewed with all else the People proved, compels inferences that defendant had an informed reason, based on his own direct knowledge, to be completely uncon-

cerned that: (a) his paramour might shortly be forced to confront his "missing wife" in her own bedroom; and (b) his early morning trip to the precinct would reunite him with her.

In addition to the foregoing powerful circumstantial evidence, the People contend that the interplay between certain items of evidence also supports the verdict. They argue that when certain established facts are juxtaposed with other proven circumstances, defendant's multiple contradictions and omissions are patently incriminating. Therefore, in the aggregate, the People convincingly advance the conclusion that the jury's verdict was correct. Illustrative—but not exhaustive—are the following examples:

1. Defendant misstated that the doorman told him he saw the victim on the afternoon of July 7, when in fact the doorman made it clear he saw her last on July 6 and he could not remember whether he saw either the victim or defendant at all on July 7;

2. Defendant described differently to different people the items the victim took and the clothes she wore when she purportedly left to sunbathe in Central Park, and whether she was then wearing shoes and her engagement ring;

3. Defendant gave contradictory accounts about whether and why he sent the living room rug out to be cleaned immediately following the decedent's disappearance, but completely withheld that information from the police;

4. He was inconsistent about his purported knowledge of his wife's post-July 7 whereabouts, alluding to different theories and purported sightings to different people. Defendant variously suggested or stated that his wife was wandering around Central Park in "a fugue state," that she had a drug problem and ran off with drug dealers, that she possibly committed suicide, that she was on a shopping spree at Bloomingdale's, that she left to hang out with "druggie friends," that she might have been killed by drug dealers, and that she had left for the Carribean to be with a boyfriend. In one instance he falsely claimed that a private detective, whom he also claimed he hired to find her, learned she was living in California with financial support from her family. Not a single shred of evidence in this record supports any of these bizarre claims;

5. Perhaps defendant's most damning omission was his repeated, false claim to the police and to others that he remained in the apartment all afternoon on July 7 and then went directly to his nephew's birthday party in New Jersey.

However, the evidence also conclusively establishes that he rented and flew a Cessna 172 airplane beginning at 4:30 P.M. that day from Caldwell Airport in Fairfield, New Jersey and returned two hours later at 6:30 P.M. He can hardly claim with any credibility that an interlude of that nature and length slipped his mind when he spoke to the police and others on the first day, or, indeed, at least four times during the first week, following his wife's "unexplained" disappearance.

Compounding the significance of that devastating omission—an omission which concealed the very means and opportunity to dispose permanently of his victim's body—is the documentary evidence found in his home several months after July 1985 showing clearly that his written flight log entry for July 7 was changed from July 7 to August 7.

Furthermore, he said to at least two people, not including the police, that he had searched for his inexplicably missing wife in Central Park on the afternoon of July 7 and there allegedly found the suntan oil and towel she had taken with her when she left the apartment at 11:00 A.M.

However, notwithstanding that, initially, the police carefully explained to him at least three times their critical need to know every detail he was able to recall in order to aid their search efforts, he withheld all of this information during their interviews with him—one encounter a mere 34 hours, and the others all within seven days—following his wife's disappearance. It is beyond cavil that this information was relevant and that it was exactly the type they implored him to convey. Instead, he consistently told the police and others that he remained in the marital apartment from the time the victim had left at 11:00 A.M. until 5:30 P.M., then going directly to his nephew's birthday party at his sister's New Jersey home;

6. During the first police interview of defendant on July 8 at 9:00 P.M., lasting 45 minutes, Detective Dalsass asked defendant for a list of the names and phone numbers of the victim's friends, relatives and others to facilitate the search efforts. Because defendant did not have a list with him, Dalsass said he would call defendant's home for it that evening. However, defendant said he would not be home until later, as he had plans to dine out—after an interview which had focused on his wife's sudden "disappearance" just 34 hours earlier. Dalsass waited until 12:30 A.M. and left the first of approximately eight messages on defendant's home answering machine and at his work number during the ensuing week. Defendant responded to none of them. Consequently, although defendant had contact

with Detective O'Malley in the interim, Detective Dalsass could not speak to defendant to obtain that vital information until the July 14 interview. Furthermore, he did not turn over the victim's telephone/address book until more than two weeks after her disappearance;

7. He told several people that, just before his wife left the apartment for the last time, they argued. Nevertheless, he contradicted himself among various versions and aspects of those statements. Furthermore, when defendant spoke to Detective Dalsass on Monday, July 8 and again on Sunday, July 14, he never said—indeed on July 8 he denied—that he and his wife argued that morning, even though Dalsass did acknowledge that defendant, on July 14, said the victim was "pissed" the morning she left. However, apparently also on July 8, defendant told the victim's therapist, Dr. Sybil Baran, that he and the victim had argued and that "she'd gone off in a huff";

8. Although defendant would not allow any police officers to view or inspect his apartment until September 30, 1985—and then only with severe restrictions—he, long before that day, falsely stated to others that the police had searched his home and car and found him to "be clean"; and

9. Defendant falsely attributed to Dr. Baran the opinion that the victim was depressed and might have committed suicide. Dr. Baran unequivocally denied she had ever made either of those statements to defendant or that she had even held these opinions. In fact, several witnesses, including Dr. Baran, described the victim's state of mind during the period before July 7 as being "happy," "jovial" and the like.

Defendant's lies, misstatements and omissions powerfully bespeak his consciousness of guilt. We recognize that the law most often views consciousness of guilt evidence as weak—but not always. The Court of Appeals has made that clear. In *People v Cintron* (95 NY2d 329, 333), the Court said that the "probative weight" of evidence of consciousness of guilt is "highly dependent upon the facts of each particular case." In an earlier case, specifically referring to a defendant's false statements, the Court said:

> "In the circumstances of this case, it is difficult to come to any other conclusion than that these false statements indicate a consciousness of guilt. We recognize that as a general proposition false statements are a relevant but weak form of evidence.

(See, e.g., *People v. Leyra*, 1 NY2d 199.) Since there may be reasons other than guilt of the crime charged which would prompt a person to give a false statement, the probative weight of such statements depends upon the facts of the particular case. On the facts here, *it is reasonable to assign a moderate degree of probative force to the false statements.*" (*People v Benzinger*, 36 NY2d 29, 33-34 [emphasis added].)

In considering whether this defendant's behavior and statements show evidence of his consciousness of guilt, we find that they unquestionably do. And, while we agree this type of evidence, alone, may not and should not form the basis for a finding of guilt, it may be taken into account in evaluating all the other evidence. We further determine that the instant body of consciousness of guilt evidence—because of its quality and quantity—exhibits a guilty mind, a finding which, in this context and under these circumstances, is surely not weak, or, for that matter, even moderate. Rather, the evidence is credible and we hold that the resulting inference is strong.

Of course, if one were to evaluate each item of evidence in isolation, a different conclusion might be reached for at least some sequestered items. But, as the law requires us to look at the body of proof as a whole, we are convinced it paints a clear picture of defendant's guilt, and that the jury's verdict is both supported by legally sufficient evidence and entirely consistent with its weight.

The People proved beyond a reasonable doubt that this defendant had the opportunity, the motive, and the intent to kill his victim, and that it was he who did so. Beyond that, the proof also clearly shows how he went about it, that she did not kill herself, nor that any boyfriend or drug dealer killed her.

Apart from the fact that defendant's alternate theories of his victim's demise have no evidentiary support, the existing evidence itself also refutes them. Her body was never found and the great weight of the evidence shows that she was anything but desperate or depressed so that one might reasonably fear she was contemplating suicide. That was the overwhelming opinion of those closest to her, including her gynecologist, her therapist of three years, and her sister, three confidantes in the best position to know. Moreover, it is unlikely that one's body would vanish without a trace in the aftermath of self-inflicted death.

As for any suggested theory that someone other than defendant killed her, no proof exists in this record which is even

remotely consistent with such speculation, and there is no one other than defendant Bierenbaum who, like he, had the motive or had the exclusive opportunity to kill her at the time and place where the victim was last seen alive; and, surely, there was no one who signaled his obvious guilt by covering and distorting the truth as this defendant repeatedly did. His claim of innocence—and the presumption which accompanies it—has been utterly overwhelmed and destroyed by the People's proof.

In our sufficiency review, we have determined that a "valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by [this jury] on the basis of the evidence at trial, viewed in the light most favorable to the People * * * " (*People v Williams*, 84 NY2d 925, 926). Furthermore, there is virtually no conflicting testimony within the People's case to compare against the weight of the People's credible proof, proof which so firmly supports this conviction. Moreover, the testimony of the only defense witness, Joel Davis, suggesting that he saw the deceased on the afternoon of July 7, was extremely weak. It was appropriately rejected by the jury. Accordingly, there can be no holding that this verdict is against the weight of the evidence.

It is clear to us that a finding other than guilt would not have been reasonable. We also conclude that even if a different finding were somehow deemed reasonable, there can be no rational view after " 'weigh [ing] the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' (*People ex rel. MacCracken v Miller*, 291 NY 55, 62 [other citations omitted])," that this jury "failed to give the evidence the weight it should be accorded" (*People v Bleakley*, 69 NY2d 490, 495).

In light of the foregoing, this verdict is supported by legally sufficient evidence and it is thoroughly consistent with the evidentiary weight.

2. *Psychiatrist's Warning Letter and Other Hearsay*

■ The Trial Justice rejected the People's pretrial request to call defendant's treating psychiatrists and psychologist as witnesses to testify about factual matters and opinions connected to their treatment of defendant, including the conversations they had with the victim and defendant's parents, after defendant's consent was procured. The court did, however, permit the prosecution to adduce testimony that the victim had received a letter from one of these psychiatrists warning her of the danger defendant posed to her, although the Justice prohibited the People from introducing the letter itself.

Notwithstanding that defendant originally consented to having the psychiatrist speak to and warn the victim and his parents, he now claims that the ruling allowing testimony only about the existence and nature of the warning letter was error because it violated his statutory privilege under CPLR 4504 (a) and it was otherwise unduly prejudicial. We disagree.

The psychiatrist communicated the consented-to warning by sending a letter, sometimes referred to as a *Tarasoff* letter (*see Tarasoff v Regents of Univ. of Cal.*, 17 Cal 3d 425, 131 Cal Rptr 14), to the victim. The Justice allowed the jury to learn only of its existence and nature, but not of its specific contents beyond its warning to the victim that defendant posed a threat to her. That ruling was correct, first, because defendant waived his CPLR 4504 (a) privilege by consenting that the warning be communicated; second, because a warning under these circumstances is an exception to the principle of confidentiality since the psychiatrist is under a duty to warn the intended target of a patient's violence; third, because the nature and existence of the warning letter were relevant to the state of the parties' marriage and defendant's motive to kill his wife in light of her stated intent to use it as leverage in her contemplated divorce action against defendant by confronting him with it and threatening to reveal its contents if he refused to meet her divorce settlement demands; and, finally, because it was relevant to prove, in addition to motive and the state of the parties' marriage, the interrelated issues of his intent to kill her and his identity as her killer.

CPLR 4504 (a) in part provides:

> "Confidential information privileged. *Unless the patient waives the privilege*, a person authorized to practice medicine * * * shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity" (emphasis added).

Because defendant consented to having the warnings and disclosures communicated, not only to the victim but also to his parents, the court's ruling about the warning letter was correct. As this Court stated in *Matter of Farrow v Allen* (194 AD2d 40), once a patient authorizes his or her psychiatrist to release what might otherwise be a privileged letter to "a third party who is completely unconnected to his or her treatment and who is not subject to any privilege," its release "is sufficient to waive the privilege as to the information contained in

the letter itself" (*id.* at 44; *cf. Doheny v Lacy*, 168 NY 213, 223-224; *Workman v Boylan Buick*, 36 AD2d 978, 979; *In re von Bulow*, 828 F2d 94, 100-101). Since none of the three of these relatives was involved in providing defendant treatment nor subject to any other privilege (*see Poppe v Poppe*, 3 NY2d 312 [marital privilege inapplicable where one spouse wrongs another]; *People v Davis*, 226 AD2d 125, 126, *lv denied* 88 NY2d 1020 [quoting *Poppe*]; *People v Govan*, 268 AD2d 689, *lv denied* 94 NY2d 920 [crime against spouse extinguishes statutory privilege]; *People v Johnson*, 84 NY2d 956 [no statutory or common-law parent/child privilege for adult child under these circumstances]), the court correctly decided that defendant waived the privilege. Furthermore, the Trial Justice gave the People even less leeway than *Farrow* permits after a waiver, by ruling that only the existence and nature of the letter—not its factual content nor the physicians' testimony—were admissible.

Therefore, the Trial Justice's ruling was a careful and completely reasonable exercise of judicial discretion.

Moreover, the ruling was correct also because of the *Tarasoff* exception to the CPLR 4504 (a) privilege. That exception provides that for compelling policy reasons the privilege can be overcome when the patient demonstrates that he poses a clear and present danger to a third party—in this case his wife. In *MacDonald v Clinger* (84 AD2d 482, 487), the Court said:

> "where a patient may be a danger to himself or others (see, e.g., *Tarasoff v Regents of Univ. of Cal.*, 17 Cal 3d 425; *Berry v Moench*, 8 Utah 2d 191; *Simonsen v Swenson*, 104 Neb 224), a physician is required to disclose to the extent necessary to protect a threatened interest. 'The protective privilege ends where the public peril begins' (*Tarasoff v Regents of Univ. of Cal., supra*, at p 442)."

Defendant also relies on the Trial Justice's rejection of the People's request to call defendant's three treating doctors to testify at trial. He thus argues that her ruling necessarily extends to preclude the People from also proving the existence and nature of the *Tarasoff* letter. However, the Trial Justice specifically stated her ruling did not apply to preclude the letter's existence and nature.

Additionally, her key reason for precluding the professionals from giving oral testimony at trial was that one of their purposes for consulting with defendant's closest family members was to gain insights from his family members,

insights which might enhance their treatment of defendant. That logic, which correctly served to preclude the doctors from testifying to the information they conveyed to and received from the family, does not apply to the existence and nature of the psychiatrist's letter whose *separate* purpose was *only* to warn a third party, this victim.

Because the letter's *separate* purpose was to warn, and, further, to insure that its disclosure at trial for that valid purpose did not publish its otherwise confidential contents—and thus breach the court's associated preclusion order—the court appropriately placed significant restrictions on the People's use of the letter. First, the court prohibited the People from showing the letter to the jury and, second, they were not permitted to adduce anything other than oral testimony describing only the type of letter the victim had received from defendant's psychiatrist.

Defendant next argues that the claimed relevancy of the *Tarasoff* letter does not justify its introduction because its prejudicial effect outweighs its probative value. He urges now—as he did at trial—that the court could have served the People's purpose adequately by only allowing the People to use the letter to inform the jury that the letter existed, and stipulating that its unspecified contents would embarrass defendant. However, the court, while prohibiting publication of its specific factual contents to the jury, did allow the jury to know that the letter warned the victim of the danger defendant posed to her. Notwithstanding defendant's argument, this limitation was, under these circumstances, an exercise of discretion which was fair to both sides for the following important reason.

One of the prosecution's key assertions was that defendant was motivated to kill his wife because she threatened to destroy him by exposing the letter's contents should he fail to meet her divorce demands. It was therefore highly relevant to the question of defendant's motive that the jury be allowed to know and consider the consequences the victim intended by threatening defendant with such a disclosure to his superiors and peers, a disclosure which would likely compromise severely his professional status, his personal reputation and standing, and his economic future. While defendant understandably argues that this ruling prejudiced him at trial, we hold that under these circumstances it did not unduly do so. It is clear to us that the highly probative nature of this particular proof on the critical questions of defendant's motive and intent, and of the killer's identity, far outweighs any prejudice (*see People v*

*Alvino,* 71 NY2d 233, 241-242). Indeed, this prosecution contention—i.e., that it helped expose defendant's motives—was a valid one, as it is at the heart of the People's case.

We note further that the court exercised its discretion appropriately by rulings which significantly and thoughtfully limited the People. The Trial Justice's carefully balanced decisions allowed the People to show only the existence and the general nature of the letter in order legitimately to probe defendant's motive. On the other hand, by concomitantly excluding the letter itself, suppressing its factual content and prohibiting the proffered testimony of defendant's three treating mental health professionals whom the People had intended to call as witnesses, these rulings protected the remaining, essential aspects of defendant's statutory privilege under CPLR 4504 (a).

Finally, the court's cautionary instructions to the jury were more than adequate to assure a relevant and fair consideration of this evidence and avoid prejudicial impact.

■ Turning next to defendant's hearsay claims, he argues that the Trial Justice erroneously allowed several People's witnesses to testify that the victim had told them that, inter alia, her marriage was stormy, that she was afraid of defendant, that he was very controlling, that there was much verbal strife between them, that her husband had occasionally made threatening statements to her, that he once choked her in 1983 rendering her unconscious, that she had taken steps to prepare to leave him, and that she had used and intended again to use the *Tarasoff* letter to threaten him if he failed to meet her divorce demands.

To begin with, the court, on a number of occasions during trial and at its conclusion, gave the jury cautionary instructions about the victim's statements and other related evidence, evidence the People had introduced to explain two critical factors, i.e., the state of this marriage and both parties' state of mind. This Court has reviewed these various instructions given during trial and at its end. We disagree with defendant and find them fair and legally satisfactory.

Defendant also disputes the instructions' adequacy, and, beyond that—in addition to urging this Court to reject the notion of a background exception to the hearsay rule—he further argues that the testimony recounting the victim's out-of-court statements was largely unreliable. He therefore contends it was inadmissible under *Nucci v Proper* (95 NY2d 597) even if it were deemed otherwise allowable. We disagree.

We hold that the reliability of this evidence, initially a question for the court to resolve, is amply supported by this record. In *Nucci*, the Court set forth the factors relevant to a trial justice's assessment of the reliability of out-of-court-statements which the People proffer as hearsay exceptions. The Court said (at 603):

> "Reliability is the sum of the circumstances surrounding the making of the statement that render the declarant worthy of belief. Relevant factors include 'spontaneity, repetition, the mental state of the declarant, absence of motive to fabricate, * * * unlikelihood of faulty recollection and the degree to which the statement was against the declarant's * * * interest' (*see People v James*, 93 NY2d 620, 642 [citing *Idaho v Wright*, 497 US 805, 821; *Dutton v Evans*, 400 US 74, 89]). Courts have also 'considered the status or relationship to the declarant of the person to whom the statement was made * * *, whether there was a coercive atmosphere, whether it was made in response to questioning and whether the statements reflect an attempt to shift blame or curry favor' (*James, supra*, 93 NY2d, at 642-643 [citing *United States v Matthews*, 20 F3d 538, 546, other citations omitted])."

The victim's contested statements meet virtually all these enumerated criteria. She was speaking spontaneously; she repeated the statements separately to various people in her life; her statements about the troubled side of their marriage were a natural consequence of corroborated facts about their marriage; she was, by all indications, in good mental health; there appears no reason for her to have fabricated the matters she discussed at the time of her utterances; and her statements largely concerned private matters that some would be embarrassed or otherwise reluctant to disclose. Furthermore, the statements were made mostly to those close to her, in contexts completely devoid of coercion, not in response to anyone's questioning, nor under circumstances at all suggestive of any attempt to curry anyone's favor.

As for defendant's remaining reliability claims, they raise questions quite properly within the jury's province. The proof more than adequately supports the jury's determinations.

Defendant also argues that although this contested hearsay information, emanating from the victim, was admitted purportedly as legitimate background evidence, there is no "back-

ground exception" to the hearsay rule, and, beyond that, this "background information" was highly prejudicial, and, therefore, the Trial Justice should have precluded it. We hold otherwise.

Most of the victim's hearsay statements, in one way or another, bespoke this couple's marital strife and unhappiness, a perception defendant himself shared and repeatedly admitted. In a domestic violence homicide, as this clearly is, it is highly probative—quite often far outweighing any prejudice—that a couple's marriage was strife-ridden and that defendant previously struck and/or threatened the spouse-victim (*see People v LaFrance*, 182 AD2d 598, 599-600, *lv denied* 80 NY2d 905; *People v Shorey*, 172 AD2d 634, *lv denied* 78 NY2d 974). Indeed, it has also been held that such evidence in like contexts is "highly probative of the defendant's motive and [i]s either directly related to or 'inextricably interwoven' (*People v Ely*, [68 NY2d 520], 529) with the issue of his identity as the killer" (*People v Linton*, 166 AD2d 670, 671, *lv denied* 77 NY2d 879; *see also People v Laverpool*, 267 AD2d 93, *lv denied* 94 NY2d 904; *People v Bonilla*, 251 AD2d 82, *lv denied* 92 NY2d 893).

Defendant asserts that because there is evidence of "only one" earlier act of violence by him against his wife, this murder case should not be considered as a "domestic violence homicide," and therefore there is no justification for the single alleged choking episode to be received in evidence along with various threats and other evidence of discord. In part, he frames his argument by citing reported "domestic violence" cases wherein the jury was allowed to learn that the victimized spouses endured more than one attack by the accused predating the violent act charged in the indictment. He thus claims that those cases do not apply to permit such evidence under these facts because this case involves evidence of only one prior assault.

We reject the notion that in a case where an alleged homicide is the second alleged violent act against a spouse—instead of, for example, the third, fourth or ninth—the case may not be treated as a "domestic violence" homicide for purposes of evidentiary rulings. Whether earlier acts of alleged violence or threats are admissible depends on the circumstances surrounding both the past and the currently charged aggressive acts or threats. A trial court must not merely count the number of past incidents, but it must engage in a qualitative assessment of the words and deeds which create the history of the relationship between defendant and alleged victim. It is on the basis of

that history and its relevance to proving an element of the crime charged—and, as well, after the court balances probative value against potential prejudice—that a court may determine the admissibility of prior evidence of aggressiveness, be it acts of domestic violence, threats or otherwise. Encouraging that type of qualitative analysis is the common theme of this state's settled law on this subject (*see People v Pena*, 251 AD2d 66, *affd* 93 NY2d 946 [prior assault admissible]; *People v Jones*, 289 AD2d 1010, *lv denied* 97 NY2d 756 [prior threats of violence and acts admissible]; *People v Lee*, 284 AD2d 412, *lv denied* 96 NY2d 921 [previous assault against victim admissible]; *People v Reynoso*, 262 AD2d 102, *lv denied* 93 NY2d 1025 [prior assault admissible]; *People v Steinberg*, 170 AD2d 50, *affd* 79 NY2d 673 [uncharged evidence of prior assaultive acts may be admissible as background to support testimony that otherwise might be unbelievable or suspect]).

Surely, one can argue as defendant does that any single aggressive act or threat, or a series of them, can suggest to a jury a general propensity to behave aggressively. On the other hand, the acts and/or threats can—separately or together—demonstrate as they do in the instant case defendant's specific intent to hurt a particular human being, i.e., in this case, his wife, and to do so physically and emotionally. They also manifest his motives to abuse and control her, to quickly end a miserable marriage, and ultimately to keep her from using the *Tarasoff* letter in a divorce proceeding to humiliate him, damage his reputation, imperil his career and jeopardize his financial future.

After reviewing the court's rulings and reasons in this regard, the other evidence, and the court's cautionary instructions to the jury during and at the trial's conclusion, we hold that none of these rulings compromised defendant's right to a fair trial.

### 3. *Excited Utterances and Prior Violence*

■ Defendant contends that the court improperly allowed the prosecution to adduce testimony, and otherwise refer to evidence, that defendant was violent, and that he choked his wife to the point of unconsciousness in late 1983. As a part of that contention, defendant also asserts that the Trial Justice erred in allowing Hillard Wiese, an attorney and the victim's cousin, to testify about the victim's purported "excited utterances" describing the choking event. The victim, whom Wiese occasionally saw at family gatherings, telephoned him at his office one afternoon in the fall of 1983. She was seeking his

advice. " [S]peaking in very hushed tones and very rapidly * * * " and "sound[ing] extremely upset," she said that "either the day before or the night before she had a fight with her husband and that during the course of that fight he had choked her into unconsciousness * * *." According to Wiese, she added "that this was not the first time that they had fought" nor "the first time he had choked her, but it was the first time she was rendered unconscious and that she was extremely upset." She apparently spoke quickly because she expected defendant to return shortly, and she needed to know what she should do.

Defendant correctly argues that the victim's statements during her telephone call to Hillard Wiese do not constitute "excited utterances." As the Court of Appeals recently wrote in *People v Vasquez* (88 NY2d 561, 579):

> "An excited utterance is one made 'under the immediate and uncontrolled domination of the senses, and during the brief period when consideration of self-interest could not have beenbrought fully to bear by reasoned reflection' (*People v Brown,* * * * 70 NY2d [513] at 518). The existence of a physical shock or trauma has often been cited as a key consideration (*see, People v Brooks*, 71 NY2d 877; *People v Brown*, 70 NY2d, at 516-517; 6 Wigmore, Evidence § 1745 [1] [Chadbourn rev ed]). While the statement must have been made before the declarant had the opportunity to reflect, ' "the time for reflection is not measured in minutes or seconds," ' but rather ' "is measured by facts." ' (*People v Marks*, 6 NY2d 67, 72, *cert denied* 362 US 912; *People v Norton*, 164 AD2d 343, 353, *affd* 79 NY2d 808.) The court must assess 'not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim' (*People v Edwards*, 47 NY2d 493, 497 * * *)."

To begin with, Wiese was unable to reliably estimate how long before his cousin called him that the choking incident occurred. Based on what he said at trial, the interval could have been as long as 24 hours, hardly a typical time span to qualify as an "excited utterance." Second, the record is totally devoid of evidence about what transpired during these many intervening hours to enable the trier of fact to determine, based on " 'the activities of the declarant in the interim,' " whether the "declarant had the opportunity to reflect * * * " (*id.*). Finally, the victim chose to call an attorney, rather than a

layperson, one with whom she did not have an especially close, personal and confidential relationship.

Consequently, it is not improbable that her call followed at least some degree of reasoned reflection. Thus, it is impossible for a court to conclude safely that her motivation was untouched by economic self-interest or unencumbered by concerns about legal strategy. Finally, although the alleged assault she recounted was undoubtedly extremely frightening, the proof shows her mental state so many hours later was not shown to be dominated by the same level of heightened excitement that would normally overwhelm a person in the *immediate* aftermath of such a recent traumatic shock.

Therefore, the Trial Justice should not have admitted the victim's statements to Hillard Wiese as "excited utterances." However, we hold that this error was harmless, because, as we noted earlier, the jury otherwise properly learned that the victim claimed defendant had committed a violent act against her in the fall of 1983, as evidence relevant to the state of their marriage, to defendant's motive, to his intent, and relevant evidence of identity. Indeed, defendant himself told his father in 1983 that their strife had reached the point of "some physical contact," and there is credible testimony that in 1985 defendant was so filled with hostility that he was tempted toward violence against his wife. Therefore, even though the victim's phone conversation with Wiese was erroneously admitted as "excited utterances," its core content was nonetheless relevant, admissible, and the jury properly heard about it from other witnesses.

Defendant counters this reasoning, contending that the 1983 choking incident and all the other evidence and references to threats and marital strife should have been precluded because they bespeak propensity and because the People improperly used the choking incident to suggest that defendant had a propensity for violence. Therefore, he argues such evidence unduly prejudiced him, outweighing any of its probative value.

This complaint—apart from ignoring or underestimating the appropriate, limiting language the court carefully chose to caution and instruct the jury—misconstrues the rationale underlying *People v Molineux* (168 NY 264) and its progeny. *Molineux* authorizes a trial justice to consider allowing a jury to hear about a defendant's prior bad acts—be they violent or otherwise—if they shed light on the issues of intent, identity, motive, absence of accident or mistake, or common plan and scheme (*id.* at 293). In other words, they "may be admitted

only if the acts help establish some element of the crime under consideration * * * " (*People v Lewis,* 69 NY2d 321, 325). In this case his behavior and threats were admitted because they revealed the former three of these five potentially relevant items.

Often, evidence of prior assaults and threats manifests general aggressiveness, i.e., a general propensity to act aggressively against other people. It is this inappropriate and distracting inference which the *Molineux* ruling and its progeny aim to bar. However, the proof here evinces defendant's intent to focus his aggression on one person, namely, his wife— his victim. That key factor in the context of marital or other intimate relationships frequently differentiates domestic violence assaults and homicides—wherein prior bad acts have often been deemed admissible during the People's direct case— from other cases wherein evidence of past assaultive behavior against people other than the victim has most properly been precluded. In the former, the previous aggression principally indicates intent, or motive, or identity; whereas in the latter it can predominantly give rise to an inference of propensity. This logic and rationale accords with well-settled law in New York in these matters (*People v Angel,* 238 AD2d 210, *lv denied* 90 NY2d 1009; *People v Bonilla, supra; People v LaFrance, supra*).

Finally, this evidence shows that this defendant was motivated and had an intent to harm this victim. There is little or nothing by way of circumstantial evidence that is more relevant or more probative in a circumstantial murder case— especially one involving domestic violence—than the type of evidence at issue on this appeal.

We also reject defendant's claims in their entirety that the prosecutor's summation exacerbated the error which he says occurred by dint of the court's decision to admit evidence of the 1983 choking incident; and that the court's charge did not, nor could it, adequately safeguard defendant's right to a fair trial. First, the court correctly ruled that defendant's objection in the form of a mistrial motion, after summations were completely over, was belated (*see People v Allende,* 269 AD2d 211, *lv denied* 95 NY2d 792; *People v Valez,* 256 AD2d 135, *lv denied* 93 NY2d 879), and its denial of the motion was a discretionary decision we perceive no reason to disturb. Second, if we were to reach the merits, we would find that the prosecutor's summation arguments on the subject, when viewed in the complete context of his closing statements, do not warrant reversal. Furthermore, when they are read together with the court's cautionary

charges wherein the Trial Justice repeated and emphasized the limited value of this and other related evidence, we firmly believe the record belies his contention that he was denied a fair trial.

4. *Medical Examiner's Testimony and Videotaped Demonstration*

■ Defendant contends: (1) that the Trial Justice improperly allowed the People to adduce opinion testimony that he was able, as a trained surgical resident, to dismember the victim's body within 10 minutes, and also capable of packing it into a flight bag, whether or not the body had been disarticulated; and (2) that the court improperly permitted the jury to watch a videotaped demonstration depicting how a pilot can, without any assistance, load a 110-pound body, so packaged, onto a Cessna 172 airplane, fly it over the ocean, and discard it overboard.

The defense argues that these rulings were improper because: (1) there was no evidentiary foundation to justify the opinion evidence and the scenario depicted in the video demonstration, i.e., that they were purportedly based on speculation; and (2) these forms of evidence are extremely potent, inflammatory, and therefore they unduly prejudiced defendant in a case like this where, according to him, there is no proof to support the opinions or the scenario shown on tape. We disagree.

As for the opinion testimony, the court exercised its discretion properly by admitting the medical examiner's expert testimony. Those opinions, contrary to defendant's argument, did not endanger the jury's objectivity, as the record in no way suggests that they were delivered in anything other than a dispassionate and brief manner. In addition, they sufficiently related to the circumstantial evidence the People offered, thus enabling the jury to understand medical and surgical matters beyond their ken and better evaluate the prosecution's theory (*People v Lee*, 96 NY2d 157).

■ Regarding the videotape, defendant stated he had "no objection" to its introduction when, on October 16, 2000, it was offered into evidence at trial. Accordingly, this claim is unpreserved and we decline to review it in the interest of justice (CPL 470.05 [2]; *People v Luperon*, 85 NY2d 71). Furthermore, defense counsel's earlier language on October 11, 2000 purporting to object was premature and, in any event, legally inadequate to constitute an "objection" (*id.*). Defendant argues that on October 11, when the People turned over to the defense copies of the videotaped demonstration and indicated they

intended to offer the videotape into evidence on October 16, the defense uttered the following: "I suspect we'll object."

However, this faint expression, on its face, is nothing more than a prediction that defendant might—or probably will in futuro—object to the video. Moreover, the Justice's immediate response—"I suspect I'll allow it"—is of no greater legal significance. It is, simply put, not a ruling in response to an actual objection based on then existing circumstances (*see People v Luperon, supra* at 78; *cf. People v Balls*, 69 NY2d 641, 642).

Notwithstanding defendant's characterization of that exchange as "wordplay," contending now it should be deemed a substantial legal objection, the attorney's words do not constitute an effective protest under CPL 470.05 (2), because the specific language would not, nor did it, prompt the court to make an actual ruling. While the attorneys and the court may have intuitively suspected what was on each other's mind, the legal process has not become, nor should it be, guesswork, mind reading, or fortune telling. Rather, it should be, and is, a process whereby trial attorneys announce an unambiguous objection, in praesenti, based on an articulated or otherwise known rationale involving logic, legal principles, and/or common sense, a protest which gives an adversary notice sufficient to frame a response, and affords the court an opportunity to issue a ruling. Defendant's so-called "objection" contains none of these ingredients.

We therefore reject as unpreserved defendant's present position regarding the video's admissibility, not because we revere form over substance, but, rather, out of our recognition of the indisputable need during a trial for clear language announcing candid and specific positions, after which judges may issue fitting rulings. Most important, if there existed any lingering ambiguity about whether defense counsel had or had not registered a cognizable objection on October 11, defense counsel himself resolved it on October 16 when he said "no objection" at the moment the People actually offered the exhibits.

Furthermore, were we to reach the merits of the videotape's admissibility, we would reject the defense argument that its contents are based on pure speculation and thus were improperly placed before the jury. This entire case leaves no doubt whatever that the contents of the videotape depict a scenario that was anything but speculation. Rather, the tape's contents clearly demonstrate the feasibility of the People's theory of this case, a theory which all of the circumstantial proof together overwhelmingly shows.

We have examined defendant's remaining contentions and find them unavailing.

Accordingly, the judgment of the Supreme Court, New York County (Leslie Crocker Snyder, J.), rendered November 29, 2000, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 20 years to life should be affirmed.

ANDRIAS, J.P., SAXE, BUCKLEY and FRIEDMAN, JJ., concur.

Judgment, Supreme Court, New York County, rendered November 29, 2000, affirmed.