[771 NYS2d 30]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MANUEL VEGA, Appellant.

First Department, January 27, 2004

**APPEARANCES OF COUNSEL**

*Stuart D. Rubin* for appellant

*Robert T. Johnson, District Attorney*, New York City (*Raffaelina Gianfrancesco* and *Karen Swiger* of counsel), for respondent.

**OPINION OF THE COURT**

Tom, J.

On August 18, 1999, defendant returned from work and sometime later, according to his statement, discovered his wife strangled to death in a back room of the apartment. The

decedent, Johanna Vega, was found wrapped in or lying on two comforters that had been intertwined and wearing only a tank-top tee shirt and a pair of panties. Defendant, a weightlifter, worked as a delivery truck driver and loader at a fish market in Hunts Point in the Bronx, and had a 3:00 to 10:00 A.M. work shift.

Detective Daniel Withers was assigned to the homicide when the call came in on August 18. He interviewed defendant at the crime scene and took his statement. In it, defendant indicated that on the prior day, which was August 17, 1999, he had arrived home from work about 1:30 P.M., took a nap until his wife woke him at 5:00 P.M., and thereafter loaned his van to his cousin Jorge Campana for a trip to Queens. Defendant also said that his wife was intermittently on the telephone, and in one conversation made plans to see their upstairs neighbor Fanny Valencia early the next morning. Defendant stated that he and his wife retired to bed at about 10:00 P.M., he awoke at 1:40 A.M. to go to work, and took their dog for a walk and moved the cars about 2:10 A.M. before leaving for work. At that time, his wife was still in bed. He allegedly called from work to wake his wife around 7:00 A.M. on the morning of August 18, but the phone was unanswered, and later asked for her in a call to Fanny around 8:00 A.M. Fanny indicated that Johanna was not there. Defendant claimed to return home around 10:00 A.M., noted the apartment door was locked and both his wife and the dog were missing, but their van was in the driveway. He watched a couple of videotapes, then started calling around, including a call to his sister-in-law, Magdalena Vialta, to inquire where his wife was. He returned to work at 12:00 P.M., and arrived home again at 3:20 P.M., but his wife was still not home. He noticed his wife's purse hanging on the bedroom door, but thought that nothing was missing from it. At about 5:00 P.M., he stepped outside the apartment and saw Fanny. Concerned, he asked her to check with local hospitals to see if anything had been reported regarding his wife. She entered the apartment with him. Everything in the apartment, though, appeared to be normal. When he entered the back bedroom, he looked at the futon, which seemed to have something in it. He opened the futon, and opened a blanket, and then saw his wife's body wrapped up inside. She was lying face down, and there was blood. He asked Fanny to call 911 and waited for the arrival of police. Detective Withers testified that he recalled that defendant's voice had been flat when he made his statement, he cried for a few seconds, and

that he indicated that the front door had been locked when he returned home. Detective Withers confirmed that employment records corroborated that defendant had been at work during some of the time periods indicated.

Jorge Campana, who had a set of keys to defendant's apartment, testified that at about 4:30 P.M. on August 17, 1999, he had entered defendant's apartment to retrieve clothing that he kept in the back room. Defendant and his wife were home at the time. Campana borrowed the van and intended to return later to ask defendant's brother, Kleber Vega, to help him move some belongings. Campana was with defendant and his wife from that time until about 6:00 P.M., when he left, but returned at about 9:30 P.M., looking for Kleber. He testified that defendant and the victim often went to sleep early. Defendant's bedroom door was closed, and he assumed that they were asleep. He left again, moving clothes to a new apartment, and returned around 11:30 to 11:45 P.M. in order to return the van. At that time, everything seemed normal, and the dog was in the apartment. He locked the front door as he left.

Fanny testified that she had planned to meet Johanna about 7:00 A.M. on August 18 in connection with a job search. She had not heard any noise from Johanna's downstairs apartment during the night. Around 6:40 A.M., she called Johanna, who did not answer. Defendant called her from work at about 8:00 A.M., and again at about 10:00 A.M., asking for his wife. He came to her apartment at about 12:30 P.M., at which time he handed Fanny's daughter some keys to give to his wife when she returned. Defendant called again around 5:00 P.M., noting that his wife's keys and pocketbook were in the apartment, but that she wasn't. She went downstairs and started looking around the apartment, during which time she heard defendant screaming from the second bedroom. She recalled that shortly thereafter, he was sitting in a chair crying.

Police Officers Christine Gombert and Daniel Going responded at about 6:00 P.M. As they entered the apartment, defendant, sitting down, pointed and said "she was back there," indicating the back room. They observed that he seemed unemotional, stared at his feet and was not crying. Officer Going saw Johanna's body on the floor of the back room. Defendant indicated at that time that he had returned home about 10:00 A.M., could not find his wife or dog, and asked the police to look for his still-missing dog. Defendant indicated that, at the time, he thought his wife might have taken the dog to the veterinarian, and also

that he thought that she was on a job search with Fanny Valencia. The officers observed that the apartment was orderly except for where the body was found. Detective Thomas Henry of the Crime Scene Unit also testified, noting that the couple's bedroom was fairly orderly, but there was blood on the pillows and a blood stain on the carpet by that bedroom's door. An earring was found next to the bed. The back bedroom seemed less orderly. An earring matching that found in the bedroom was in the victim's ear. Her upper lip was swollen, blood seemed to drip from her lip and nose, no defensive wounds were found on her hands, and rigor mortis had not yet set in. There was no sign of forced entry, the windows were all locked, and no fingerprints of any forensic value were recovered. Detective Withers arrived. Withers observed that defendant had no scratches or cuts, and appeared normal and unexcited. Defendant agreed to go to the precinct, where he gave the statement summarized above. Detective Withers also testified that he had interviewed a Cathy Diaz, who had lived with the Vegas for a while, who indicated that she had previously seen bruises on Johanna. Detective Withers testified that defendant went to the precinct again on November 23, 1999, to inquire into the status of the investigation, at which time he indicated that the marital relationship had been good and that they had had sexual relations the night of her death, at which time he ejaculated in her. Parenthetically, defendant provided similar testimony to the grand jury. Withers testified that defendant contacted him a few days later to inform him that he was relocating to a relative's house. Magdalena Vialta, decedent's sister, testified that she had accompanied defendant back to Ecuador for the burial, during which time he seemed unemotional.

There was no physical evidence linking defendant to the homicide and therefore, no action was taken against him for approximately nine months. During that time, Detective Withers interviewed Johanna's close friend Anna Alcivar on February 2, 2000, and Detective Infante interviewed Andres Benavides, decedent's former supervisor, on December 23, 1999. Through these interviews the detectives learned of a stormy marriage marred by prior instances of domestic violence. Defendant was arrested on May 27, 2000 and charged with the murder of Johanna Vega.

The People sought to introduce evidence at trial of pre-1999 domestic violence by providing a detailed offer of proof which resulted in a *Ventimiglia* hearing. At the hearing, Alcivar, who

considered the deceased her best friend, testified that on one night in September or October 1995, Johanna, bruised and bloody, went to her home crying that defendant beat her. Although she brought no extra clothes, she stayed for three days, at which time defendant called and spoke to Johanna. He arrived thereafter, expressed remorse for hitting her and promised not to do so again, after which they left. Again in February 1996, Johanna, bruised on her face, arms and legs and bleeding from her lip and nose, arrived again around 6:30 P.M., crying that defendant had hit and beat her again. She again stayed for three days, after which defendant again arrived and took her home. On another occasion, in April 1996, Alcivar saw defendant beating Johanna in their home. Defendant had pushed Johanna against a wall, and, as he prepared to punch her with a closed fist, Alcivar stepped in between, prompting defendant to kick Alcivar's arm and leg before hitting Johanna in the face. Johanna had to put makeup on her face as other guests arrived. Andres Benavides, Johanna's supervisor at the Garden Diner where she worked, testified that during the summer of 1998, he saw Johanna, bruised on the lip and forehead, crying in the diner's parking lot. She told him that her appearance would prevent her from working, that she needed some time off and that she was going to go to her sister's home. Magdalena Vialta testified that in July of 1998, Johanna, bruised and bleeding, went to Vialta's home after work, but that she had not spent the night.

The trial court ruled that Alcivar could testify at trial as to the observations she made of the deceased's injuries, of the deceased's explanation, and of defendant's apologies. Benavides could testify only as to his observations and as to the deceased's plans to stay with her sister. The excited utterance exception applied to Alcivar's testimony, but not that of Benavides or Vialta. The court found the evidence was probative of the state of the marital relationship, defendant's motive and his identity.

On the People's case, these witnesses gave substantially the same testimony at trial as in the *Ventimiglia* hearing but in compliance with the court's ruling. Dr. Margaret Prial, the medical examiner, testified that death had been caused by asphyxiation resulting from compression of the chest, neck, mouth and nose, all of which contained bruises, which apparently had occurred while the victim was smothered by a pillow while someone knelt or sat on her chest. The victim also had contusions on the right side of her forehead, a bruise on the left eyelid, red

welts on her body and a scrape on her cheekbone. Bruises inside her lips were consistent with the victim having been struck in the mouth. Dr. Prial thought that the victim had been struggling to force the pillow away during the smothering. She estimated time of death from the limited extent of rigor mortis, factoring in the temperature of the room and that the body was wrapped in a blanket, to be about 9:00 to 10:00 P.M. on August 17, 1999. She did, however, concede that death could have occurred at various times during the early morning hours of August 18 but indicated that the probability decreased as the hours increased beyond 10:00 P.M. on August 17. Sheila Estasio, a forensic biologist in the medical examiner's office, testified that the victim's blood was recovered from several items, and that DNA recovered from a stain on the pillow, possibly resulting from drooling, belonged to the victim as well as defendant. The blood on the comforters and the living room carpet belonged to the victim. Especially with regard to the stained carpet, one may draw the inference that the victim, after death, had been transported over that carpet to the back room. This inference is supported by evidence that one earring was found by the bed, while Johanna still wore the matching earring. There was no indication of a sexual assault, and no semen was recovered from her body. We note this latter finding is inconsistent with defendant's statement that he had ejaculated in his wife the prior night. Ms. Estasio also testified that no skin scrapings were recovered from the victim's fingernails. No one else's DNA was recovered.

On the defense case, Detective Withers, recalled to the stand, testified that he decided to arrest defendant only after he had interviewed Alcivar. Oscar Vivar testified that he had lived with the Vegas in 1995 and 1996, and had witnessed the fight described by Alcivar, but that it was only verbal, did not get physical, and that the couple returned to the living room immediately thereafter. He never saw them fight otherwise. Miguel Martinez, who worked with defendant, testified that defendant had punched in at work at 2:30 A.M. on August 18 and that he had actually seen him at about 3:00 A.M., and that defendant had made all of his scheduled deliveries. Raymond LaSalle, likewise, could verify that defendant had been at work, and saw defendant crying at the Bronx funeral. Defendant's brother Kleber had been sleeping at his father's New Jersey house on the night of Johanna's death, where he was awakened by police the following night, and that his distraught brother was crying

when Kleber arrived at the precinct. Kleber testified that he had never seen bruises on Johanna.

Defendant was convicted of murder in the second degree, and sentenced to 25 years to life. On appeal, defendant argues, among other grounds, that the trial court committed reversible error when it admitted into evidence the pre-1999 domestic violence before the jury in violation of *People v Molineux* (168 NY 264 [1901]).

■ In this essentially circumstantial evidence case, the evidence of prior uncharged crimes, consisting of testimony regarding prior instances of spousal abuse, was critical to the conviction. As such, defendant's challenge to that evidence is pivotal to this appeal. Defendant challenges the testimony that he had previously beat his wife as unduly prejudicing the jury, as well as on the grounds that it was hearsay and did not satisfy the excited utterance exception to the hearsay rule.

Evidence is generally considered relevant if it has any tendency to prove any material fact, and as such is admissible at trial unless otherwise barred by an exclusionary rule (*People v Lewis*, 69 NY2d 321, 325 [1987]). For instance, notwithstanding the probative value of evidence of other crimes similar to the crime of which the defendant presently stands accused, exclusionary rules have developed for policy reasons to avoid situations where juries convict accused on collateral matters, such as a criminal history (*People v Allweiss*, 48 NY2d 40, 46 [1979]). It is well established in New York that evidence of a defendant's prior uncharged crimes is generally precluded in order to protect the defendant from a verdict that rests inappropriately on information that displays a propensity toward crime rather than specific evidence of the involvement with the crime actually charged (*People v Molineux, supra*; *People v Alvino*, 71 NY2d 233, 241 [1987]; *People v Ventimiglia*, 52 NY2d 350, 359 [1981]; Prince, Richardson on Evidence § 4-501 [Farrell 11th ed]). As the Court of Appeals stated on the 100th anniversary of the *Molineux* doctrine, "propensity evidence invites a jury to misfocus, if not base its verdict, on a defendant's prior crimes rather than on the evidence—or lack of evidence—relating to the case before it" (*People v Rojas*, 97 NY2d 32, 36-37 [2001]). Hence, if the only purpose of the proposed evidence is to show that the defendant has a bad character or a propensity toward bad conduct, it will be precluded (*People v Alvino, supra* at 241).

The potential for prejudice arising from misused evidence of prior criminal activity is beyond cavil. However, exceptions have

been judicially crafted under the general rubric of *Molineux* in order to allow the introduction of relevant and material evidence tending to establish factors bearing on the crime actually charged rather than propensity, with the additional proviso that such a probative value must outweigh the potential for undue prejudice. Hence, in *Molineux*, the Court of Appeals stated that evidence of uncharged crimes may be introduced to show motive, intent, absence of mistake or accident, a common scheme or plan, or the identity of the defendant (*Molineux, supra* at 293), although that list has not been construed as being exhaustive (*People v Jackson*, 39 NY2d 64 [1976]; *People v Alvino, supra* at 242), so that the necessity of proposed testimony as "background material" has also been recognized as a valid *Molineux* category (*People v Till*, 87 NY2d 835, 837 [1995]; *People v Montanez*, 41 NY2d 53, 58 [1976]). Moreover, the Court of Appeals has recently emphasized that not all prior crime evidence, to be admissible, need pass through the *Molineux* prism: it may be introduced to refute a defendant's misleading contentions bearing on his guilt or innocence (*People v Rojas*, 97 NY2d 32, 38 [2001]). Although the question whether evidence of prior crimes may be admitted is one of law (*People v Fiore*, 34 NY2d 81, 84 [1974]), if the evidence is legally relevant and material of an issue before the court and thus "not automatically barred under the general rule, admissibility turns on the discretionary balancing of the probative value and the need for the evidence against the potential for delay, surprise and prejudice" (*People v Alvino, supra* at 242; *accord People v Till, supra*; *People v Ventimiglia, supra* at 359). Thus, as we have recently stated, if the proposed evidence, even if similar to the crime charged, is not relevant to a fact in issue, or even if probative in that sense, if its prejudicial effect unduly outweighs its probativeness, the evidence may not be admitted (*People v Foster*, 295 AD2d 110 [2002], *lv denied* 98 NY2d 710 [2002]). Finally, when the evidence is introduced, proper cautionary instructions must be provided to ensure that the jury is advised that the evidence must be considered only for the purpose for which it was introduced (*People v Till, supra*).

We had occasion to review the fundamental goals of the *Molineux* doctrine in our recent ruling in *People v Bierenbaum* (301 AD2d 119 [2002], *lv denied* 99 NY2d 626 [2003], *cert denied* — US —, 124 S Ct 134 [2003]), another circumstantial evidence case relying in part on evidence of prior domestic violence to prove the wife's murder by the husband, in which the prosecu-

tion could not even produce a body. Although *Bierenbaum* was an expansive utilization of the doctrine, it was based on sound precedents and was consistent with preexisting law (*People v Bonilla*, 251 AD2d 82 [1998], *lv denied* 92 NY2d 893 [1998] [prior violence toward defendant's girlfriend]; *People v LaFrance*, 182 AD2d 598 [1992], *lv denied* 80 NY2d 905 [1992] [defendant's prior violence toward fiancée]; *People v Mendez*, 165 AD2d 751 [1990], *lv denied* 77 NY2d 880 [1991] [defendant's prior violence toward common-law wife]). In *Bierenbaum*, we noted that evidence of the husband's prior threats and violence toward his wife satisfied three of the classic five *Molineux* categories: intent, motive and identity. Although courts must be concerned that evidence of prior assaults may distract a jury into consideration of a defendant's general propensity for aggressiveness, in *Bierenbaum* we noted that "the proof . . . evince[d] defendant's intent to focus his aggression on one person, namely, his wife—his victim" (*id.* at 150). This Court found that "[t]hat key factor in the context of marital or other intimate relationships frequently differentiates domestic violence assaults and homicides—wherein prior bad acts have often been deemed admissible during the People's direct case— from other cases wherein evidence of past assaultive behavior against people other than the victim has most properly been precluded. In the former, the previous aggression principally indicates intent, or motive, or identity; whereas in the latter it can predominantly give rise to an inference of propensity" (*id.*). Especially when such evidence bears on motive or intent, "[t]here is little or nothing by way of circumstantial evidence that is more relevant or more probative in a circumstantial murder case—especially one involving domestic violence—than the type of evidence at issue" in that case (*id.*).

That reasoning presently guides us. Unlike *Bierenbaum*, there is a body with ample evidence of a violent murder, but no direct evidence of the identity of the murderer, or the motive for the killing. As to identity, although various of defendant's relatives had keys to the apartment, there was no evidence offered to show that they had a motive to cause harm to Johanna. Though conceivably his cousin or brother could have entered the apartment after he left for work during the early morning hours the next day, the likelihood of that scenario diminishes significantly as the time period became later than 10:00 p.m., if the medical examiner's testimony is to be credited, and there is no reason to discredit her opinions and conclusions. Here, the evidence of

marital strife accentuates the potential identification of the murderer, so that a history of prior marital violence would be evidence relevant to determine whether defendant, from among a small group of people, perpetrated the crime.

Additionally, the jury was free to consider the issue of motive: no sexual assault was perpetrated, no robbery occurred, and, considering the care with which the body was concealed, this does not appear to have been a random act of violence. The only evidence to show someone with a motive to kill the decedent was the evidence that defendant had a history of inflicting physical injury to the decedent. Defendant's prior acts of violence against his wife, which consisted of beatings on the body and the face, supported the prosecutor's theory that the domestic violence continued and ultimately caused her death. In fact, she suffered a similar beating on the body and the face as a result of an assault committed apparently immediately preceding death. Absent this evidence, the murder would seem senseless, especially in view of defendant's assertion that the marriage was "good." Similarly, the evidence was relevant on the issue regarding the state of the marital relationship. Curiously, apparently to substantiate the health of the marriage and thus deflect attention from himself as a suspect—at which defendant actually succeeded for a period of months—defendant volunteered to the investigating detective that he had had sex with his wife the evening of the murder and that he had ejaculated in her. This claim seems belied by the evidence provided by the medical examiner's office when no semen was found in decedent's body. The jury might wonder why defendant would have made an apparent misstatement having to do with the marital relationship. The evidence of a tumultuous and even physically abusive relationship, then, would be probative of the actual state of the relationship. Hence, the challenged evidence would have been probative of relevant issues presented to the jury, rather than being introduced merely to demonstrate the defendant's propensity for violence. While this evidence undoubtedly had a prejudicial effect, as does all evidence introduced against a criminal defendant, it was not unduly prejudicial, especially when weighed against its significant probative value in a case devoid of clear-cut clues as to the identity of the killer and the reason for the killing.

■ We also reject the hearsay challenge to introduction of Alcivar's testimony regarding Johanna's physical appearance at her home in 1995 and 1996 as the victim of domestic violence,

and that Johanna had cried when explaining that defendant had beat her. Alcivar testified that her home was only about 15 minutes away from the Vega home. The trial court admitted the testimony on the basis that Johanna's statements satisfied the excited utterance exception to the hearsay rule. Generally, "[a]n excited utterance is one made 'under the immediate and uncontrolled domination of the senses, and during the brief period when consideration of self-interest could not have been brought fully to bear by reasoned reflection' " (*People v Vasquez*, 88 NY2d 561, 579 [1996], quoting *People v Brown*, 70 NY2d 513, 518 [1987]). Among the factors that courts will consider is whether there has been physical shock or trauma (*People v Vasquez, supra* at 579; *People v Brown, supra* at 516-517), considerations clearly operating in the present case. The necessary inquiry is whether the declarant had had the opportunity to reflect between the particular event and the statement, but we must evaluate her ability to reflect according to the particular aspects of the event rather than merely by the passage of time. Hence, as we noted in *Bierenbaum* (*supra* at 148), we must factor in not only the lapse of time, but also the nature of the trauma and the activities of the declarant in the interim (*see People v Edwards*, 47 NY2d 493, 497 [1979]). Notably, Alcivar's testimony adequately indicates that Johanna had speedily left her apartment for refuge in Alcivar's nearby home, as evidenced by her failure to bring any clothing or personal articles such as would be necessary for an overnight stay, let alone a stay of several days, by Johanna's obvious agitation when she arrived, and by the presence of fresh blood. Hence, the inference of a close proximity in time between the beatings and Johanna's appearance is soundly supported. Moreover, the inference is equally supported that the obvious physical and emotional trauma caused by the beatings would have impeded speedy reflection, and that she remained under the influence of the stress precipitated by the trauma; there is no indication in the record that Johanna, during the seemingly brief interval, did anything other than flee directly to Alcivar's home. As such, unlike the facts adduced in *Bierenbaum*, there is no reason on this record to conclude that the excitement caused by the traumatic events had subsided with the mere passage of time when Johanna made the statements. On this record, we cannot conclude that the trial court thereby abused its discretion (*cf. People v Carroll*, 95 NY2d 375 [2000]).

■ The evidence upon which the conviction was predicated was legally sufficient to support the charges (*People v Contes*, 60

NY2d 620 [1983]; *People v Rodriguez*, 302 AD2d 240 [2003], *lv denied* 99 NY2d 658 [2003]), and the verdict was not against the weight of the evidence (*People v Bleakley*, 69 NY2d 490, 495 [1987]; *People v Bierenbaum, supra* at 132). Defendant's own narrative showed his presence in the apartment at approximately the time of the murder. He indicated that he was home with his wife between 9:00 and 10:00 P.M. on August 17, 1999, which, according to the medical examiner, was the estimated time of the murder. Moreover, the body was found clothed as though for sleep, rather than in daytime clothing, further supporting the inference that she was killed at nighttime. There were no signs of forced entry and the windows were locked from the inside, which would indicate that the perpetrator had access to the apartment. Also, as to outsiders who might have undertaken violence against Johanna, there is the classic clue of the dog that did not bark, which would seem to apply literally in this case. The dog was curiously absent, or if present, silent, which begs for an explanation if, in fact, an intruder entered the apartment or even if a known party entered but attacked Johanna.

Defendant's remaining claims are unpreserved, and do not warrant review in the interest of justice, and none, in any event, provide a basis for reversal.

Accordingly, the judgment of the Supreme Court, Bronx County (Ira Globerman, J.), rendered on or about July 12, 2002, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 25 years to life, should be affirmed.

NARDELLI, J.P., SULLIVAN, ELLERIN and FRIEDMAN, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on or about July 12, 2002, affirmed.