OPINION OF THE COURT
Joel M. Goldberg, J.
This case came before me in July of 2008 by direction of the Administrative Judge of this court following the recusal of the previously assigned judge. At that time, there were several motions pending decision which are decided herein.
By an indictment filed April 13, 2007, the defendant is charged with murder in the second degree (Penal Law § 125.25 [4]), manslaughter in the first degree (Penal Law § 125.20 [4]), manslaughter in the second degree (Penal Law § 125.15 [1]), and endangering the welfare of a child (Penal Law § 260.10 [1]), for causing the death of her newborn baby girl who was found by the police outside the defendant’s house inside a plastic garbage bag after the defendant had been taken to a hospital where it was determined that the defendant had recently given birth.
The defendant, by a motion dated March 25, 2008, moved, in part, before the prior judge for a reinspection by the court of the grand jury minutes to determine the legal sufficiency of the evidence before the grand jury and for release of the grand jury *453 minutes to defense counsel to assist the court in determining this branch of the motion. The prior judge, eight months before, after inspecting the grand jury minutes, had found, in an order dated July 25, 2007, that the grand jury minutes were legally sufficient to support the charges.
The People responded to this motion to reinspect with an affirmation in opposition, dated April 15, 2008.
The defendant filed a reply, dated April 23, 2008, which raised the issue of whether privileged physician-patient communications were improperly used by the People in the grand jury proceedings and to obtain a search warrant of the defendant’s home.
On April 30, 2008, the prior judge, in an oral decision, granted the defense motion to reinspect the grand jury minutes and ordered the release of a copy to the defense to assist the court in determining whether privileged physician-patient communications were improperly used (1) to support probable cause to issue a search warrant of the defendant’s home and (2) as evidence before the grand jury, and, if so, whether the indictment should be dismissed as a result, and further, (3) whether there was legally sufficient evidence before the grand jury to support the charge of manslaughter in the first degree (Penal Law § 125.20 [4]), which requires an “intent to cause physical injury.”
The People responded by an affirmation and memorandum of law, each dated May 28, 2008, and the defendant responded in papers dated June 17, 2008.
While these motions were pending, the case was assigned to this court for all purposes including decisions on these motions.
The Grand Jury Evidence
The following is a summary of the evidence before the grand jury:
Diane Easier, a New York State registered emergency medical technician (EMT) volunteering with BRAVO Volunteer Ambulance Service responded on April 6, 2007 to a call a little before 10:00 p.m. to go to xxxx Colonial Road in Brooklyn. The caller said her daughter was bleeding.
Upon arriving and being admitted at the door, Easier went upstairs and saw a woman whose name she later learned to be Laura Sergio, the defendant, sitting on a bathroom toilet. Easier observed that the defendant was “diaphoretic,” meaning sweat *454 ing, clammy and that the bathroom shower had “some blood clots” in it and that the water in the toilet was a little bloody (grand jury minutes, Apr. 10, 2007, at 7). Easier asked the defendant if she was pregnant or had been pregnant. The defendant said, “No” {id. at 7-8). The defendant was then transported to Lutheran Medical Center.
Police Officer Peter Aponte of the 68th Precinct responded to xxxx Colonial Road at about 3:00 a.m. as a result of a supervisor telling him that Lutheran Medical Center had called “stating they had a female who apparently has given birth and the baby was not with the female” {id. at 11). (The Assistant District Attorney [ADA] later instructed the grand jury to consider this evidence as well as similar testimony from another police officer and testimony regarding a statement by Andrea Sergio, “only as it relates to what the police officers did after these statements were given to them” [grand jury minutes, Apr. 12, 2007, at 13].)
The weather was cold that night. Upon the police ringing the front door bell, a female, later learned to be Andrea Sergio, answered. She said she was the defendant’s sister. Officer Aponte asked if the baby was with her. At first Andrea Sergio “stated she didn’t know anything in regards to the baby,” but after Officer Aponte “persistently asked” if the baby was in the house, Andrea Sergio said, “well, there is [sic] some bags in the back of the house” (grand jury minutes, Apr. 10, 2007, at 12).
Andrea Sergio directed Officer Aponte to the back porch where there were other police officers present. A female baby was found wrapped in a bloody towel inside a black garbage bag which also contained a shopping bag. The baby, pink in color, was brought inside and placed on a kitchen table and later taken away in an ambulance.
Police Officer Michael Coleman was one of the other officers at the house. He was present holding a flashlight when the bag containing the baby was first opened by Police Officer Joseph Sinissi. Inside he saw bloody towels, a shopping bag, as well as the baby. The baby still had the umbilical cord attached to it.
Officer Coleman escorted the ambulance that took the baby to Lutheran Medical Center where it had no signs of life. He subsequently identified the baby at the Medical Examiner’s Office.
Doctor Melissa Pasquale, a New York City Medical Examiner qualified as an expert in forensic pathology, performed an *455 autopsy on the baby. The baby was a recently-born, full-term, fully-formed, blood-stained baby girl that had been born alive and still had its umbilical cord attached. The baby had been alive long enough to breath and have some air bubbles pass through its stomach down through its intestines. A large hematoma was found at the cut end of the baby’s umbilical cord where blood does not flow after a baby is dead.
Doctor Pasquale determined the cause of death to be “asphyxia and hypothermia due to environmental exposure to cold temperature” and the manner of death to be homicide (grand jury minutes, Apr. 11, 2007, at 14). “Homicide” was later defined by the ADA as, “any conduct which causes the death of a person under circumstances constituting Murder, Manslaughter in the First or Second Degree, or Criminally Negligent Homicide” (grand jury minutes, Apr. 12, 2007, at 8; see Penal Law § 125.00).
According to Doctor Pasquale, in her opinion and to a reasonable degree of medical certainty, these conclusions were consistent with the baby being placed in a towel in a plastic bag and left outside for several hours.
A certified business record from the New York State Department of Motor Vehicles was introduced in evidence from which the ADA read, “Laura Sergio, [xxxx] Colonial Road, Brooklyn, New York, 11209. Date of Birth, [xx/xx]/1982” (grand jury minutes, Apr. 12, 2007, at 5).
A certified medical record of the defendant from Lutheran Medical Center was also introduced in evidence, from which the ADA read, “25 year-old female, admitted on April 6, 2007, after a spontaneous vaginal delivery at home” (id. at 6-7).
Discussion
I. Applicability of the Physician-Patient Privilege
The defendant contends that the physician-patient privilege as codified in CPLR 4504 (a) (the privilege) is applicable to both her communications to the emergency medical services (EMS) volunteer and to Lutheran Medical Center personnel and that disclosure of these communications to the grand jury and to the court for purposes of obtaining a search warrant for the defendant’s home renders the grand jury proceedings defective and the fruits of the search warrant inadmissible.
The People argue that even if the privilege applies, use of evidence in violation of the privilege does not require dismissal *456 (citing People v Sinski, 88 NY2d 487 [1996]; People v Mauceri, 74 AD2d 833 [2d Dept 1980]; People v Oakley, 28 NY2d 309 [1971]). However, both Mauceri and Oakley are not applicable. Those cases hold that a valid indictment may be based on competent and admissible evidence that was subsequently suppressed after a suppression hearing, because at the time the evidence was put before the grand jury, there was no judicial finding that the evidence was obtained in violation of the respective defendants’ constitutional rights. (See CPL 190.65 [1] [a grand jury may indict when (a) the evidence before it is “legally sufficient” (see CPL 70.10 [1]) and (b) competent and admissible evidence provides “reasonable cause to believe” (see CPL 70.10 [2]) the defendant committed the offense charged].) Evidence barred by the physician-patient privilege would not be “competent and admissible evidence” at the time it was heard by the grand jury.
People v Sinski is more on point. It states that an indictment need not be dismissed as defective pursuant to CPL 210.35 (5) upon a subsequent finding that the People introduced evidence before the grand jury in violation of the privilege. The Court’s decision in Sinski not to dismiss the indictment does not constitute an unequivocal holding that the use of privileged medical information to obtain an indictment is not a basis to dismiss the indictment. Rather, the Court’s decision in Sinski not to dismiss was based on the facts of that particular case:
“The People’s position throughout these proceedings that the evidence was not privileged was not only colorable, it was sustained by the trial court and the Appellate Division. Thus, we find no basis to conclude that the use of such evidence, even though its reception violated the defendant’s right to confidentiality, required dismissal under CPL 210.35 (5).” (People v Sinski, 88 NY2d at 495.)
In Sinski, the Court of Appeals did not articulate any standard for trial courts to use in determining whether to dismiss an indictment based on a violation of the physician-patient privilege other than a determination as to whether the People had a good faith belief that the evidence did not violate the privilege and even if so, whether, pursuant to CPL 210.35 (5), the integrity of the proceedings was “impaired” by the use of the evidence resulting in possible “prejudice” to the defendant.
Therefore, pursuant to People v Sinski, this decision will first determine whether the People violated the privilege before the *457 grand jury. Only if the privilege was, in fact, violated, will it then be necessary to determine as a matter of discretion, pursuant to People v Sinski and CPL 210.35 (5), whether the indictment should be dismissed.
The People additionally contend that the privilege, as a matter of law, does not apply to the statement made to the EMS volunteer, who was not a physician or employed by a physician (i.e., the defendant responded “No” when asked by the EMS volunteer if she is or had been pregnant).
The People further argue, without any supporting detail, that the presence of the defendant’s mother during her treatment at Lutheran Medical Center constitutes a waiver of any confidentiality as to what transpired there. In response to this contention, the defense argues that the defendant’s mother was not present during the privileged conversations at Lutheran Medical Center, and even if the defendant’s mother was present at either the conversations at Lutheran Medical Center or the conversation with the EMS volunteer, those conversations were intended by the defendant to be confidential and, given the defendant’s physical and mental condition at the time, the defendant was not capable of making a valid waiver of the privilege.
Obviously, resolution of these issues concerning a waiver would require a hearing. Neither side has either submitted factual affidavits from witnesses who were present or even revealed who these witnesses would be. Nevertheless, because the applicability of the privilege can be resolved solely by the grand jury minutes, a hearing on the issue of waiver is not necessary, particularly in the absence of sworn factual allegations by either party in support of their respective factual contentions. (See CPL 210.45 [1] [requiring a motion to dismiss an indictment to contain sworn allegations of fact based upon either personal knowledge or, if not, stating the sources of the information].)
The physician-patient privilege did not exist at common law. In 1828, New York became the first state to enact a physician-patient privilege statute. (See Matter of Grand Jury Investigation in N.Y. County, 98 NY2d 525, 529 [2002]; Dillenbeck v Hess, 73 NY2d 278, 284 [1989].) The physician-patient privilege is currently codified in CPLR 4504 (a). The relevant text of the statute states,
“Unless the patient waives the privilege, a person authorized to practice medicine, registered professional nursing, licensed practical nursing, dentistry, *458 podiatry or chiropractic shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.”
Although in derogation of the common law, the physician-patient privilege is to be given a “broad and liberal construction to carry out its policy.” (Matter of Grand Jury Investigation of Onondaga County, 59 NY2d 130, 134 [1983], quoting Matter of City Council of City of N.Y. v Goldwater, 284 NY 296, 300 [1940].) Courts have “narrowly construed statutes limiting the privilege and rejected claims that there is a general public interest exception to CPLR 4504.” (People v Sinski, 88 NY2d at 492.) The rationale supporting the privilege is that the protection of confidential information from involuntary disclosure will promote uninhibited communication between patient and physician for the purpose of obtaining appropriate medical treatment. (Id. at 491.)
The privilege concerns not only the direct communication between the doctor and patient but other information acquired based on the relationship. The information that may qualify includes “not only communications received from the lips of the patient but such knowledge as may be acquired from the patient himself, from the statements of others who may surround him at the time, or from observation of his appearance and symptoms.” (Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C4504.-2 [b], at 160, quoting Edington v Mutual Life Ins. Co. of N.Y., 67 NY 185, 194 [1876].)
The information must also fall within “the realms” of medical diagnosis and treatment (Matter of Grand Jury Investigation in N.Y. County, 98 NY2d at 530), and the privilege prohibits physicians and other medical personnel, in the absence of a waiver by the patient, from revealing “any information which [they] acquired in attending a patient in a professional capacity, and which was necessary to enable [them] to act in that capacity.” (People v Strawbridge, 299 AD2d 584, 590 [3d Dept 2002]; see also People v Sinski, 88 NY2d at 491; Dillenbeck v Hess, 73 NY2d at 283, 284 n 4.)
The form in which the privileged information is stored, whether in the memory of the physician or medical records is irrelevant if the information qualifies for the privilege. (See Williams v Roosevelt Hosp., 66 NY2d 391, 396 [1985].)
Except for the unique circumstances of this case, the People would not dispute a determination that the defendant’s Lu *459 theran Medical Center records would be covered by the privilege.
The People also do not argue that because the defendant’s condition in Lutheran Medical Center would have been readily perceived by a layperson, the privilege does not apply. (See People v Capra, 17 NY2d 670 [1966] [privilege did not apply to emergency room doctor’s observation of packet of heroin that fell from accident victim’s boot]; Goldin v Mejia, 294 AD2d 231 [1st Dept 2002] [privilege not applicable to hospital employee’s observation of urine on bed and floor of patient’s room].) No witness from Lutheran Medical Center testified before the grand jury, and it cannot be determined from examination of the defendant’s medical records alone if any of the observations or conclusions in those medical records would have been readily apparent to a layperson. Indeed, “[m]edical records are not organized on the basis of what laypersons — as opposed to medical professionals — might discern.” (Matter of Grand Jury Investigation in N.Y. County, 98 NY2d at 531-532.)
A. Lutheran Medical Center
It is the People’s principal contention that because the now deceased newborn baby girl was “a child,” the information obtained from the defendant by Lutheran Medical Center was not protected by the privilege.
The People cite CPLR 4504 (b), which in relevant part states, “A physician, dentist, podiatrist, chiropractor or nurse shall be required to disclose information indicating that a patient who is under the age of sixteen years has been the victim of a crime” (emphasis supplied), and argue that, therefore, invocation of the privilege in cases where a child has been murdered “is inappropriate.”
However, CPLR 4504 (b) applies only where the child is the patient, and in this case it was the defendant, not the child, who was the patient of Lutheran Medical Center. Similarly, pursuant to CPLR 4508 (a) (3), certified social workers may testify about information acquired from a client under the age of 16 indicating that the child has been the victim or subject of a crime where the child, not the parent, is the holder of the privilege.
Although society certainly has an interest in protecting children that may override its interest in fostering the confidentiality of the physician-patient relationship (see People v Easter, 90 Misc 2d 748, 752 [Albany County Ct 1977]), because the *460 deceased newborn was not the patient of Lutheran Medical Center the exception to the privilege contained in CPLR 4504 (b) does not apply to the facts of this case.
Nevertheless, the above-noted specific CPLR exceptions where the child is the patient or client, express a clear legislative intent not to allow CPLR-created privileges to obstruct judicial determinations regarding issues concerning the safety or welfare of children. (See also Family Ct Act § 1046 [specifically stating that in Family Court proceedings, neither the physician-patient nor several other listed CPLR privileges shall be grounds for excluding otherwise admissible evidence].)
More persuasive is the People’s reliance on Social Services Law § 415 which requires immediate “[r]eports of suspected child abuse or maltreatment” from persons or officials required to make such reports (i.e., “mandated reporters” such as physicians, registered nurses, emergency medical technicians, and hospital personnel engaged in the admission, examination, care or treatment of persons [Social Services Law § 413 (1)]). Social Services Law § 415 also states that
“[Notwithstanding the privileges set forth in article forty-five of the civil practice law and rules, and any other provision of law to the contrary, mandated reporters . . . are required to comply with all requests for [relevant] records made by a child protective service ... of any patient or client that are essential for a full investigation” (emphasis supplied).
Section 415 further provides that written reports of child abuse or maltreatment by mandated reporters “shall be admissible in evidence in any proceedings relating to child abuse or maltreatment''’ (emphasis supplied).
Evidence of reports made pursuant to Social Services Law § 415 is admissible in criminal prosecutions as well as child protective proceedings “where the defendant’s statements trigger the requirement to report,” even where the child was not the patient being treated. (People v Gearhart, 148 Misc 2d 249, 255 [Nassau County Ct 1990]; see also People v Strawbridge, 299 AD2d at 590-592 [information provided pursuant to Social Services Law § 415 by hospital personnel treating the mother of a deceased newborn can later be used in a criminal proceeding against the mother for murdering her child, although introduction of evidence at trial of the mother’s entire health records concerning her pregnancy was error]; People v Rodriguez, 7 *461 Misc 3d 1023[A], 2005 NY Slip Op 50715[U] [Suffolk County Ct 2005] [Social Services Law exception to physician-patient privilege allows use, in mother’s criminal trial for murder, of testimony concerning her condition and statements during her initial presentment in hospital emergency room, including her denial of being pregnant or having given birth up to the time the hospital staff called 911 to report a missing baby]; cf. People v Bass, 140 Misc 2d 57 [Sup Ct, Bronx County 1988].)
The defendant argues that the specific provisions of the Social Services Law requiring disclosure of abuse or maltreatment and allowing the use of the written reports in any related proceeding notwithstanding the physician-patient privilege are inapplicable to this case, because the child was deceased at the time of the grand jury presentation and there was obviously no danger of any future harm being caused to the child. However as noted above, the Third Department in Strawbridge (299 AD2d at 591) has expressly stated that the Social Services Law permits limited portions of hospital records of a mother’s pregnancy to be admissible at her trial for murdering her child. The trial court in Rodriguez (7 Misc 3d 1023[A], 2005 NY Slip Op 50715[U]) has also found the Social Services Law to allow for limited use of a mother’s hospital records in her trial on similar charges.
Although the defendant’s entire Lutheran Medical Center records were introduced in evidence before the grand jury, the only portion that was read to the grand jury stated, “25 year-old female, admitted on April 6, 2007, after a spontaneous vaginal delivery at home.” There was also testimony from Police Officer Aponte (concerning which the ADA subsequently gave a limiting instruction) that, a “supervisor received a call from Lutheran Medical Center stating they had a female who apparently has given birth and the baby was not with the female.”
The limited information about the defendant’s having recently given birth and her missing baby was within the appropriate confines of the Social Services Law exception concerning information relating to reports of suspected child abuse or maltreatment. This limited information was required to be immediately disclosed pursuant to Social Services Law § 415 and, pursuant to that statute and the above-cited cases, was also subject to being used in subsequent criminal proceedings relating to possible abuse or maltreatment of the child, regardless of whether the child was alive at the time of the proceedings.
Insofar as the hospital records may have contained additional medical information not within the exception to the physician- *462 patient privilege of the Social Services Law, the defendant was not prejudiced by the failure to redact that information to the extent that the failure to redact impaired the integrity of the proceedings. (People v Sinski, 88 NY2d at 495.) Therefore, dismissal of the indictment for the failure to redact the Lutheran Medical Center records is not warranted. (CPL 210.35 [5].)
B. Defendant’s Statements to EMT Kasler
Neither CPLR 4504 (a) nor any other statute specifically includes emergency medical technicians among those to whom communications may be privileged. To the contrary, the Legislature has, in Social Services Law § 413, specifically included EMTs as well as physicians as mandated reporters of suspected child abuse or maltreatment. Thus, even if there is some legal rationale for judicially extending the privilege in this case to the defendant’s statement to EMT Kasler, the same Social Services Law statutes that permitted disclosure to the grand jury of Lutheran Medical Center’s determination that the defendant had recently given birth, would also permit the disclosure of the defendant’s denial of that fact to EMT Kasler, who is also a mandated reporter of child abuse and maltreatment.
The People contend that regardless of whether the Social Services Law exception applies to EMTs, the defendant’s statement to EMT Kasler was not covered by the privilege (citing People v Ackerson, 149 Misc 2d 882 [Monroe County Ct 1991] [EMT responding to scene of motor vehicle accident to stabilize injured allegedly intoxicated driver was not acting as an agent of a physician to obtain information for the physician’s subsequent diagnosis and treatment and, therefore, the driver’s statements to the EMT were not covered by the privilege]).
The defendant contends that Ackerson should not be followed and, instead, argues that the privilege be applied, based upon a judicial determination that EMT Kasler, when asking the defendant if she had been pregnant, was acting as an agent of the doctors at Lutheran Medical Center. Indeed, other lower courts have not followed Ackerson and have applied the privilege to EMTs based upon the policy reasons underlying the privilege. (People v Mirque, 195 Misc 2d 375, 381 [Crim Ct, Bronx County 2003] [information obtained by EMT from injured driver was required to be given to hospital emergency room personnel and, thus, the EMT was found to be acting as a “field agent” of the hospital medical staff despite the lack of any employment relationship]; People v Hanf, 159 Misc 2d 748 [Monroe County Ct *463 1994] [found an EMT is specifically included in CPLR 4504 (a) as a “person authorized to practice medicine”].)
As noted, it is not necessary to this decision to determine whether EMT Easier was acting as a “field agent” for Lutheran Medical Center or whether she is “a person authorized to practice medicine” within the meaning of CPLR 4504 (a). If the answer to these questions are in the negative, the privilege does not apply. If the answer to either question is affirmative, the exception to the privilege contained in the Social Services Law applies. In either situation, EMT Easler’s testimony before the grand jury did not disclose a confidential communication from the defendant in violation of the privilege.
C. The Tarasoff Exception to the Privilege
Although there is no general “public interest” exception to the privilege, New York has judicially recognized that the confidentiality obligations embodied in the privilege of CPLR 4504 (a) must be overcome in those instances where silence would place an innocent person’s life in jeopardy and that the disclosure of otherwise confidential information made under these circumstances may later be used against the patient in a criminal proceeding. (People v Bierenbaum, 301 AD2d 119, 141 [1st Dept 2002], lv denied 99 NY2d 626 [2003], cert denied 540 US 821 [2003].) In Bierenbaum, the Appellate Division recognized the applicability to CPLR 4504 (a) of the so-called “Tarasoff exception.” (See Tarasoff v Regents of Univ. of Cal., 17 Cal 3d 425, 551 P2d 334 [1976] [when a psychotherapist determines that a patient presents a serious danger of violence to another, the psychotherapist incurs an obligation to use reasonable care to protect the intended victim against such danger and to take such steps as are necessary, including warning the victim and notifying the police of the specific details of the danger].)
Bierenbaum, a circumstantial evidence case, involved a defendant convicted of murdering his wife whose body was never found, because allegedly the defendant, a licensed pilot, dropped the corpse into the Atlantic Ocean from a rented airplane. The trial evidence revealed that before the homicide, one of the defendant’s treating psychiatrists had sent a “Tarasoff letter” to the defendant’s wife warning her of the danger the psychiatrist believed the defendant posed to her.
The Appellate Division held that information about the defendant’s expressed intentions to harm his wife made to his psychiatrist was properly introduced at the murder trial, both because the defendant had previously consented that his wife be *464 informed and, “also because of the Tarasoff exception to the CPLR 4504 (a) privilege. That exception provides that for compelling policy reasons the privilege can be overcome when the patient demonstrates that he poses a clear and present danger to a third party — in this case his wife.” (People v Bierenbaum, 301 AD2d at 142.)
In this case, even in the absence of the specific provisions of the Social Services Law requiring limited disclosure by the hospital and the EMT of what they reasonably believed was evidence of child abuse or maltreatment, there was a common-law obligation recognized by the Tarasoff exception for both the hospital and the EMT to make whatever disclosures would be necessary to determine if the life of the defendant’s newborn baby was in danger.
The Tarasoff exception would be applicable to an emergency situation where either a child’s or an adult’s life was in danger, whereas the specific obligations of the Social Services Law protecting children would not apply to an endangered adult. If, for example, a patient in New York told his emergency room doctor that he was injured by the woman he was keeping locked up in chains in his basement, there would seem to be no question that, pursuant to the Tarasoff exception, the doctor would have an obligation to notify the police to rescue the woman. (Sending the woman a “warning letter” would not suffice, just as in this case nothing short of immediately notifying the police would have been a sufficient response to a mother denying having given birth and claiming no knowledge of the whereabouts of her newborn baby.)
Overcoming the privilege under these emergency circumstances would have a minimal, if any, negative effect on the goals underlying the privilege. A patient should have no expectation of confidentiality when the patient communicates information indicating that a third person’s life may be in danger (regardless of whether that endangered person is a child or an adult). In this case, regardless of what may have been the defendant’s own particular state of mind at the time of her statements to EMT Kasler and to the medical personnel at Lutheran Medical Center, no reasonable woman who had just given birth and whose baby was missing would expect her denial of those facts to people treating her to be kept confidential from public officials responsible for locating and protecting the baby.
It is a well established constitutional doctrine that the police can enter premises without a search warrant to protect individu *465 ais in distress, to assist victims of crimes that have just occurred, or to investigate suspicious signs of impending danger. (Kamins, New York Search and Seizure § 4.03 [3] [c], at 4-120 [2008 ed]; see People v Dallas, 8 NY3d 890 [2007]; People v Mitchell, 39 NY2d 173 [1976].) Considerations of “public safety” will also allow custodial interrogation without Miranda warnings. (New York v Quarles, 467 US 649 [1984].) In both situations, the evidence acquired pursuant to these exceptions will be admissible in a criminal prosecution. Therefore, where a similar emergency exists and it is necessary to disclose an otherwise privileged communication to a physician in order to respond properly to that emergency, the patient should not expect that the disclosed communication will thereafter be confidential.
Accordingly, it was not a violation of the privilege for the People to put this limited information concerning the defendant’s statement and medical condition before the grand jury.
D. The Search Warrant
Because the information concerning the defendant’s medical condition, i.e., that she had recently given birth and the whereabouts of the baby were unknown, was properly disclosed to the police pursuant to the Social Services Law and the Tarasoff exception, inclusion of this information by the police in the application for the search warrant did not violate the privilege.
Moreover, even if it did, “evidence obtained as a result of a violation of the physician-patient privilege need not be suppressed at a criminal trial,” because violation of a statutory privilege “does not, without more, justify suppressing the evidence to which that violation leads.” (People v Greene, 9 NY3d 277, 279-280 [2007].) The principal purpose of the privilege relates to facilitating full disclosure by the patient, not protection of the patient’s constitutional privacy rights or any other constitutional right. (See People v Patterson, 78 NY2d 711 [1991] [violation of CPL 160.50 “sealing statute” whereby police used an arrest photograph taken of defendant in a case that was later dismissed to obtain an identification of the defendant in a subsequent case did not infringe on a constitutional right to the defendant sufficient to justify suppressing the in-court identification of the defendant in the subsequent case].)
The defendant further contends that the police improperly searched the defendant’s home prior to obtaining the search warrant and used information obtained in that search in the affidavit supporting the search warrant. The prior judge previously ordered a hearing on this issue.
*466 II. Legal Sufficiency of the Grand Jury Evidence
The defendant contends that “there was simply no evidence in the Grand Jury, be it direct, circumstantial or otherwise, connecting Laura Sergio to the crimes charged,” and that “the Grand Jury presentation established no more than the fact that Laura gave birth and in the midst of a medical emergency, provided an uncertain understanding or response [when asked by the EMT] to her state of pregnancy.” The defendant additionally contends that there was no evidence that the defendant had an “intent to cause physical injury” to the baby, a necessary element of the charge of manslaughter in the first degree, or even “an intent to cause the death” of the baby.
An indictment or any count thereof may be dismissed if the evidence before the grand jury was not “legally sufficient to establish the offense charged.” (CPL 210.20 [1] [b].) “Legally sufficient evidence” means “competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant’s commission thereof.” (CPL 70.10 [1].) Where, as in this case, an indictment
“is based entirely upon circumstantial evidence, legal sufficiency is not measured by the standard applied at trial — i.e., the evidence need not be wholly inconsistent with innocence or exclude innocent hypotheses to a ‘moral certainty’. This is because the degree of certitude required of grand jurors is ‘reasonable cause’, not guilt beyond a reasonable doubt. Thus the test is whether the facts proved in the Grand Jury will rationally supply an inference of guilt of every element of the offense charged.” (Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11A, CPL 190.65, at 105-106 [emphasis supplied]; People v Jensen, 86 NY2d 248, 252 [1995] [“(t)he inquiry of the reviewing court is limited to ascertaining the ‘legal sufficiency’ of the evidence, and does not include weighing the proof or examining its adequacy at the Grand Jury stage, or determining whether there was reasonable cause to believe the accused committed the crimes charged, as the resolution of such questions is exclusively the province of the Grand Jury” (citations omitted and emphasis supplied)]; People v Deegan, 69 NY2d 976, 979 [1987] [“(t)hat other, innocent inferences could possibly be drawn from the facts is irrelevant on this pleading stage inquiry, as long as the Grand *467 Jury could rationally have drawn the guilty inference”]; see also People v Bello, 92 NY2d 523, 526 [1998]; People v Jennings, 69 NY2d 103, 115 [1986].)
In this case, there was competent evidence, which if accepted as true and when viewed in a light most favorable to the People, rationally supported an inference of guilt for each of the crimes charged, notwithstanding that the evidence also shows that inferences not consistent with guilt could also be drawn. (People v Mikuszewski, 73 NY2d 407, 411 [1989].) As noted, whether this evidence also provides “reasonable cause to believe” the defendant committed any of the crimes charged was a determination exclusively for the grand jury, not a court reviewing the sufficiency of the evidence to sustain an indictment. (People v Galatro, 84 NY2d 160, 163-164 [1994].)
Viewed in a light most favorable to the People, the evidence showed that the defendant had recently given birth, falsely denied to the EMT she had done so, withheld from medical personnel information about the whereabouts of the newborn baby who, several hours later, was found by the police outside her house on a cold night wrapped in bloody towels and inside a bag, concealed in a larger tightly-tied garbage bag and who later died as a result of asphyxia and hypothermia due to environmental exposure to cold temperature.
This evidence supports a rational inference (although not necessarily an exclusive inference) that the defendant, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of serious physical injury or death to her baby and thereby caused the baby’s death, which would sustain the count charging murder in the second degree (Penal Law § 125.25 [4]).
Similarly, a rational inference could also be drawn that the defendant, acting with intent to cause physical injury to the baby, recklessly engaged in conduct creating a grave risk of serious physical injury to the baby and thereby caused the baby’s death, which would sustain the counts charging manslaughter in the first degree (Penal Law § 125.20 [4]) and manslaughter in the second degree (Penal Law § 125.15 [1]).
Finally, a rational inference could also be drawn that the defendant knowingly acted in a manner likely to be injurious to the physical welfare of the baby, which would sustain the count charging endangering the welfare of a child (Penal Law § 260.10 [1]).
The prior judge had raised the particular question, which the defendant now also raises, of whether there was “legally suf *468 ficient evidence” to show that the defendant had the specific intent to cause “physical injury” to her newborn baby, a necessary element of the charge of manslaughter in the first degree (Penal Law § 125.20 [4]). Because the evidence before the grand jury need only show that a “rational inference” of such a specific intent could be drawn, the evidence was legally sufficient to support that charge, even though such an inference might not be the only possible, or even most likely, inference. A court reviewing the legal sufficiency of the grand jury minutes to support the charge of manslaughter in the first degree is not empowered to determine whether there is also “reasonable cause to believe” the defendant intended to cause physical injury to the baby, even though the grand jury in other counts also found that the defendant acted recklessly in causing the baby’s death. Such a determination is exclusively for the grand jury. (People v Jennings, 69 NY2d at 115.) Indeed, a grand jury may properly indict on “inconsistent counts” where the specific intent to cause death alleged in one count would necessarily negate the specific reckless mental state alleged in another count. (CPL 300.30 [5]; Matter of Suarez v Byrne, 10 NY3d 523, 534 [2008], citing People v Gallagher, 69 NY2d 525, 529 [1987].)
In this case, the evidence would have been legally sufficient to support a rational inference that not only did the defendant merely intend to cause “physical injury” to her baby, she also intended to cause the baby’s death. Even if the evidence were sufficient to support a charge of intentional murder of the baby, that fact alone would not preclude the grand jury from exercising its discretionary power to charge only a lesser offense of manslaughter. (People v Sullivan, 68 NY2d 495, 501 [1986].)
This court has also considered the legal sufficiency of the evidence supporting the charge of murder in the second degree (Penal Law § 125.25 [4]) which requires the defendant to have acted “[u]nder circumstances evincing a depraved indifference to human life.” In accordance with the doctrine set forth in People v Suarez (6 NY3d 202 [2005]), the evidence was also legally sufficient to support that charge.
Finally, the People elicited testimony from the medical examiner that the “manner of death” was “Homicide,” which the defendant contends was prejudicial error.
In this circumstantial evidence case where there was no direct evidence presented either of the defendant’s or anyone else’s specific conduct toward the baby after it was born, or the circumstances surrounding the placing of the baby in the garbage *469 bag, it was improper for the medical examiner to, in effect, give an expert opinion that some person or persons had committed a criminal act, which would include the requisite criminal intent, resulting in the baby’s death.
Such an opinion in this case was not only beyond the expertise of the medical examiner, it also infringed upon the grand jury’s exclusive province of drawing inferences from facts which did not require the assistance of an expert. (People v Hicks, 2 NY3d 750, 751 [2004]; People v Cronin, 60 NY2d 430, 432 [1983] [expert testimony is admissible where the conclusions to be drawn from the facts depend upon professional or scientific knowledge or skill and are beyond the ken of the average juror]; compare People v Roth, 80 NY2d 239, 243 [1992] [grand jury properly received expert testimony that fatal explosion was caused by a particular unsafe condition]; People v Odell, 26 AD3d 527, 529 [3d Dept 2006] [trial jury improperly allowed to hear People’s expert opine that three infants’ deaths constituted “homicides”]; People v Eberle, 265 AD2d 881, 882 [4th Dept 1999]; People v McCart, 157 AD2d 194, 197-198 [4th Dept 1990]; People v James, 123 AD2d 644 [2d Dept 1986].)
Nevertheless, because there was no conflicting evidence suggesting a particular innocent explanation for the manner of death, the medical examiner’s opinion that the cause of death was “Homicide” did not prejudice the defendant; therefore, dismissal based on this testimony is not warranted. (CPL 210.35 [5].)
Accordingly, the defendant’s motion to dismiss the indictment is denied in its entirety.
III. Other Matters
Upon this court’s review of the pending motions, the court took note that count one of the indictment charges that the defendant caused the death of “a person less than seventeen years old,” whereas the applicable statute (Penal Law § 125.25 [4]), requires that the person be less than “eleven” years old.
Further, count two charges that the defendant acted with intent to cause “serious physical injury,” whereas the applicable statute (Penal Law § 125.20 [4]), requires an intent to cause “physical” injury.
For both counts, the grand jury was given the correct statutory definition; the error was made in preparing the indictment. The court, through its law clerk, notified the parties of these errors.
*470 Subsequently, the People filed a motion, dated August 28, 2008, to amend counts one and two. This motion is returnable September 9, 2008, which coincides with the previously adjourned date of the case. This court will not further delay a decision on the motions discussed herein while awaiting a defense response to this woefully delayed People’s motion to amend the indictment which was made over 15 months after the defendant’s arraignment. Given the previous glacial pace of the proceedings in this case, the pending defense motions are decided herein without waiting for a defense response to the People’s belated motion to amend the indictment.
In addition, although the defendant was arraigned over a year ago on May 8, 2007, the defense, on its first appearance before this court on July 31, 2008, when asked by the court about whether it had filed a notice of intent to offer psychiatric evidence, stated that it was undecided about whether psychiatric evidence would be offered, even though, pursuant to CPL 250.10 (2), such a notice “must” be filed within 30 days from arraignment. The defense then requested and was granted until September 9, 2008 to file such a notice if so inclined.